'(April 9, 1903.)'

## STUART v. HAUSER.

[72 Pac. 719.]

CONFLICT IN EVIDENCE—ABSOLUTE DEED—MORTGAGE—EQUITY SUIT. 1. In an equity suit by a grantor to have a deed absolute on its face declared to be a mortgage, when there is a substantial conflict in the evidence the finding of the trial court that such deed was not intended as a mortgage will not be disturbed. 2. The rule that an appellate court will not disturb the finding or decision of a trial court where there is a substantial conflict in the evidence is applicable to suits in equity as well as in actions at law, where the suit is tried on oral evidence.

(Syllabus by the court.)

APPEAL from District Court, Washington County.

The facts are fully stated in the opinion.

Alfred A. Fraser and Milton G. Cage, for Appellant.

Where the relation of debtor and creditor exists and conveyances are made, or property is delivered by the debtor to the creditor, the legal presumption is that the relation continues and that the transfers were made as further security for the debt. (*Hickok v. Lewe,* 10 Cal. 207; *Marshall v. Thompson,* 39 Minn. 137, 39 N. W. 309; *Simpson v. First Nat. Bank,* 93 Fed. 309.) If an existing indebtedness forms the consideration of a deed absolute in form, the relation of debtor and creditor continuing the inference is that the deed was made to

secure the debt, not to transfer the title. (*Montgomery v. Spect,* 55 Cal. 352; *Riley v. Starr,* 48 Neb. 243, 67 N. W. 187; *Raffier v. Womack,* 30 Tex. 332; *Huscheon v. Huscheon,* 71 Cal. 407, 12 Pac. 410; *Pioneer etc. Co. v. Baker,* 10 Saw. 539, 23 Fed. 258; *Campbell v. Dearborn,* 109 Mass. 130, 12 Am. Rep. 671; *Russell v. Southard,* 12 How. 139; 4 Wait's Actions and Defenses, 541, 542; *Horn v. Ketettas,* 46 N. Y. 605.) It is of great importance to inquire whether the consideration was adequate to induce a sale. When no fraud is practiced, and no inequitable advantage taken of pressing wants, owners of property do not sell it for a consideration manifestly inadequate, and therefore in the cases on this subject, great stress is justly laid upon the fact that what is alleged to have been the price bore no proportion to the value of the thing said to have been sold. (*Conway v. Alexander,* 7 Cranch, 241; *Morris v. Nixon,* 1 How. 126; *Vernon v. Bethell,* 2 Eden, 110; *Oldham v. Halley,* 2 J. J. Marsh. 114; *Edrington v. Harper,* 3 J. J. Marsh. 354, 20 Am. Dec. 145; Jones on Mortgages, sec. 329; *Russell v. Southard, supra; Peugh v. Davis,* 96 U. S. 332; *Wright v. Mahaffey,* 76 Iowa, 96, 40 N. W. 112; *Ennor v. Thompson,* 46 Ill. 214.) "Evidence of the continuance of the debt, such as the payment of interest upon it, or the extension of time of payment, is generally conclusive of the character of the original transaction as a mortgage. It shows either that a pre-existing debt was not surrendered or canceled at the time of the conveyance, or in case there was no such debt, it shows that one was then created." (Jones on Mortgages, sec. 325; *Westlake v. Horton,* 85 Ill. 228; *Budd v. Van Orden,* 33 N. J. Eq. 143.) "Wherever the transaction is between the parties whose relations are of a close fiduciary character, the complainant is not held to the same exactitude and strictness of proof, nor is the testimony offered in support of the bill to be viewed with the same scrutiny as in those cases where the parties deal with each other at arm's length." (*Bohn v. Bohn,* 9 Colo. 100, 10 Pac. 790; *Keith v. Kellan,* 35 Fed. 243.) When the intent of the party to a deed absolute in form is doubtful, the instrument will be construed as a mortgage. (*Russell v. Southard, supra; Mitchell v. Well-*

*man,* 80 Ala. 16; *Rich v. Doan,* 35 Vt. 125; *Reed .v. Reed,* 75 Me. 264; *Crane v. Bonnell,* 2 N. J. Eq. 264; *Honore v. Hutchings,* 8 Bush, 687; *Cornell v. Hall,* 22 Mich. 377; *Gibson v. Martin,* 38 Ark. 207; *Rogers v. Burrus,* 53 Wis. 530, 9 N. W. 786; *Book v. Beasly,* 138 Mo. 455, 40 S. W. 101.)

W. E. Borah, for Respondents.

The record presents a conflict of evidence and is peculiarly of that nature and class of cases which it is within the province of the lower court to determine, and when it is so determined such determination is final as to the facts. The real and controlling question in the case is the fact as to whether or not this was intended as a deed or a mortgage. With that fact settled, all the other matters presented are immaterial, and that fact has been fairly determined by the court below and the finding of the lower court should not be disturbed under such circumstances. This rule is well established, of course, but we call attention to some of the authorities upon the subject. In the case below the court said: "The decision of a court in the trial of a cause is of the same force and effect as the verdict of a jury in a jury trial, and when there is substantial conflict in the testimony it is the duty of the appellate court to affirm the decision." (*Sabin v. Burke,* 4 Idaho, 28, 37 Pac. 355.) "Where there is a substantial conflict in the evidence a finding of fact based thereon will not be disturbed." (*Spaulding v. Railway Co.,* 5 Idaho, 528, 51 Pac. 408; *Murphy v. Montandon,* 4 Idaho, 320, 39 Pac. 105; *State v. Haverly,* 4 Idaho, 484, 42 Pac. 506; *Sears v. Flodstrom,* 5 Idaho, 314, 49 Pac. 11; *Simpson v. Remington,* 6 Idaho, 681, 59 Pac. 360.) "A grantor who makes an absolute conveyance intending that the beneficial interest shall remain in him is guilty of a gross folly or actuated by sinister designs, and cannot reasonably ask that the rules of law should be suspended to extricate him from the situation in which he has voluntarily placed himself." (2 Leading Cases in Equity, 978; *Cake v. Schull,* 45 N. J. Eq. 208, 16 Atl. 434; *Cadman v. Peter,* 118 U. S. 80, 6 Sup. Ct. Rep. 957; *Coyle v. Davis,* 6 Sup. Ct. Rep. 108, 116 U. S. 583; *Appeal of Fisher,* 132 Pa.

St. 488, 19 Atl. 276; 3 Pomeroy's Equity Jurisprudence, sec. 1196; *Tilden v. Streeter*, 45 Mich. 533, 8 N. W. 502; *Knight v. McCord*, 63 Iowa, 429, 19 N. W. 310; *Kibby v. Harsh*, 61 Iowa, 196, 16 N. W. 85; *Ensinger v. Ensinger*, 75 Iowa, 89, 39 N. W. 208; *Strong v. Strong*, 126 Ill. 301, 18 N. E. 665; *Sloan v. Becker*, 34 Minn. 491, 26 N. W. 730; *Johnson v.Vanvelsor*, 43 Mich. 208, 5 N. W. 265; *Todd v. Campbell*, 32 Pa. St. 254; *Winters v. Swift*, 2 Idaho, 61, 3 Pac. 15; 1 Jones on Mortgages, sec. 326.) We were somewhat surprised at the position taken by the learned counsel for appellant to the effect that the rule is so well established that the finding of the lower court upon a conflict of evidence will not be disturbed does not prevail in equity cases. But as a matter of investigation, and in view of the fact that counsel broadly stated that we had not, and could not, cite any equity cases where this rule had been invoked and indorsed, and in order that this may be fully and fairly presented to the court and finally put at rest, we ask leave to cite the following cases upon this subject: *Brison v. Brison*, 90 Cal. 323, 27 Pac. 189; *Sullivan v. Moorhead*, 99 Cal. 157, 33 Pac. 796; *Sherman v. Sandell*, 106 Cal. 373, 39 Pac. 797; *Mahony v. Bostwick*, 96 Cal. 53, 31 Am. St. Rep. 175, 30 Pac. 1020; *Doe v. Valle*jo, 29 Cal. 391. We do not care to take up further space in the brief or the time of the court in quoting from the authorities, but we venture to say that there is not now to be found any distinction in this respect whatever, and that the rule obtains just as pronounced in equity cases as it does in law cases, that is, that where there is a conflict of the testimony the finding of the lower court is conclusive, and we cite below without quoting a few of the many cases which might be cited: *Silva v. Packard*, 14 Utah, 245, 47 Pac. 144; *Gagliardo v. Hoberlin*, 18 Cal. 395; *Duff v. Fisher*, 15 Cal. 379; *Green v. Butler*, 26 Cal. 595; *Hihn v. Peck*, 30 Cal. 28; *Ortman v. Dixon*, 13 Cal. 34; *Donohoe v. Mining Co.*, 66 Cal. 317, 5 Pac. 495; *Lyons v. Lyons*, 18 Cal. 488; *Clark v. Willett*, 35 Cal. 534; *Dwyer v. Manufacturing Co.*, 14 Utah, 339, 47 Pac. 311; *O'Toole v. Melander*, 2 Ariz. 392, 17 Pac. 564.

SULLIVAN, C. J.—This suit was brought by the appellant, Granville Stuart, against the defendants, Samuel T. Hauser, Massena Bullard, trustee, A. M. Holter, Charles W. Whitcomb, J. C. Rogers, F. W. Sharp, and Eugene T. Wilson, receiver of the First National Bank of Helena, Montana, to have a certain instrument, which appears upon its face to be an absolute deed, declared to be a mortgage, and the property conveyed by said instrument declared to be the property of appellant. Described in said instrument is all of the interest of the appellant in and to the Peacock, White Monument, and Helena lode mining claims, situated in Seven Devils Mining District, Washington county, state of Idaho.

The allegations of the complaint cover a period of more than twenty years, extending from prior to August 6, 1879, to March 5, 1901, the date of the commencement of this suit. In substance, it is alleged: That Stuart, who is plaintiff and appellant, and respondent Hauser, were personal friends, between whom there existed the closest relations, social, business and political, by reason of which Stuart reposed in Hauser the greatest trust and confidence, and that at all times mentioned in the complaint Hauser exerted over Stuart an unusual influence. That from about the year 1866, and until its suspension on the third day of September, 1896, Hauser was the president of the First National Bank of Helena, Montana, and during all of said time was one of its trustees, and the principal manager and director of its affairs; and that on said third day of September said bank became insolvent, suspended payment, and the defendant Eugene T. Wilson was appointed receiver thereof. That prior to the sixth day of August, 1879, Stuart and Hauser mutually agreed that they would jointly acquire interests in the above-named mining claims. That under four several purchases (three from Levi Allen and one from I. I. Lewis, who were the original locators of said mining claims) they jointly acquired a fifteen-sixteenths interest in said Peacock and White Monument claims and an eleven-sixteenths in said Helena claim. That the title to said interests were taken in the name of Hauser, except the title to a one-fourth interest in the Peacock and White Monument, which was taken in the name of Hauser &

Stuart, each having paid one-half of the purchase price for said interests, and each owning an undivided one-half interest thereof. That on October 19, 1886, said Hauser sold and conveyed to one Albert Kleinschmidt an undivided four-sixteenths interest in said mining claims for $10,000, and on January 21, 1887, said Hauser sold and conveyed to said Kleinschmidt a further undivided three-sixteenths interest in said mining claims for $11,250, and that said Kleinschmidt had thereafter transferred said seven-sixteenths interest to the American Mining Company, Limited. That said Hauser thereafter conveyed to said mining company all the interest owned by him in and to the said mining claims, together with an undivided three thirty-seconds interest therein belonging to Stuart, and that no part of the consideration paid by Kleinschmidt had been paid to Stuart. That Stuart now is the owner of a seven-sixteenths interest in said Peacock and White Monument claims, and an eleven thirty-seconds interest in said Helena claim, which interests are of the value of $1,000,000. That on the fourth day of September, 1890, and for a long time prior thereto, Stuart had been largely indebted to said bank, and on said date, and for the sole purpose of securing said indebtedness, Stuart and his wife executed and delivered to Hauser, then president of said bank, a deed in terms conveying to him all of the right, title, and interest of Stuart and his wife in said mining claims. That Hauser never paid said bank any part of Stuart's said indebtedness. That each and every part of the conveyances made by Hauser to either of the other defendants and the interest thereby conveyed is subject and subordinate to the rights of this appellant, subject, however, to such as the said bank, and its receiver, Wilson, may have thereto as security for the indebtedness due from appellant to said bank. That in violation of appellant's rights and of the trust and confidence reposed in said Hauser by appellant, the said Hauser, prior to the commencement of this action, and since the fourth day of September, 1890, either by direct or mesne conveyances, pretended to transfer and convey to the defendants Holter and Bullard all interest in said mining claims mentioned in the complaint, the legal title to which stood in said Hauser's name, and

that said Holter and Bullard held the legal title to seven-six-teenths of said Peacock and White Monument claims and eleven thirty-seconds of the Helena claim in trust for appellant. That on or about the first day of January, 1896, the defendants Holter and Hauser, pretending to be the owners of said named interests in said mining claims as aforesaid, entered into an agreement with one Lucien Eaves, wherein they agreed to sell to him the said mentioned interests in and to said mining claims, and that under said agreement said Eaves paid to said Holter and Hauser $40,000—one-half thereof to each; and that they have received other large sums as rents and profits of said property, and as a royalty for ores extracted therefrom, the exact amount of which is unknown to appellant. And prays that he be adjudged to be the owner of an undivided seven-sixteenths of said Peacock and White Monument claims and eleven thirty-seconds of said Helena claim, and that it be decreed that said Holter and Bullard hold the legal title to such interest for appellant, and that they be required to convey said interest to appellant subject to the liens of said bank; that the defendants Holter and Hauser be required to account to appellant for rents, profits, moneys, and values of every kind received by them on account of their pretended interests in said mining claims, and that appellant have judgment against them therefor; that the amount due from appellant to said bank be ascertained, and that the amount so found to be due be adjudged to be a lien upon said mining claims in favor of said Wilson, as receiver; and for such further relief as the court may deem just.

The material allegations as to said deed having been executed and given as security for the indebtedness of appellant to said bank and some other allegations of the complaint were put in issue by the answers of Holter and Bullard and the separate answer of Hauser. The other three defendants were not served with summons, and the cause was dismissed as to them.

Upon the issues thus made the trial was had, and judgment entered against appellant. This appeal is from the judgment and the order overruling the motion for a new trial. A number of errors are assigned, one of which is the insufficiency of the evidence to support the findings of fact or to justify the de-

cision. In determining this specification of error it will be necessary to recite some of the history of this case as shown by the evidence. It is made to appear that the appellant and the respondent Hauser settled in the territory, now state, of Montana, at an early date, and became acquainted in 1862, both residing at Pioneer Gulch, in Deer Lodge county, at that time; that an association sprung up between them in 1863; that the appellant's brother, James Stuart, in the spring of 1863, organized an expedition to go into the Yellowstone country. Mr. Hauser was one of the party. The evidence shows that from that time to the year 1900 appellant and said Hauser were very warm personal friends, and that there existed the close relations, social, business, and political, between them up to about the time of the commencement of this suit. It also appears that said appellant reposed great confidence in the respondent. In the year 1866 the First National Bank of Helena, Montana, was organized by Hauser and others, he being the controlling spirit and the principal owner. Stuart, during a number of years, was a trusted employee in said bank, and after he severed his connection therewith, he, Hauser, and others entered into an extensive stock-raising proposition, buying, selling, raising, and marketing cattle, with their headquarters at Ft. McGinnis, Montana. Stuart had charge of that enterprise for several years, and resided at Ft. McGinnis. Owing to severe winter weather in 1886 and 1887, they had heavy losses of cattle, and the enterprise was not a success financially. Stuart ceased to be the manager of said enterprise, but retained an interest therein, and in September, 1890, removed from the cattle ranch to Butte, Montana. After severing his connection therewith as manager, he was connected with Hauser in a number of stock deals and mining enterprises in Montana. In 1894 Stuart was appointed envoy extraordinary and minister plenipotentiary to the republics of Uraguay and Paraguay, and left Montana on the 3d of April, 1894, for South America, and remained there four years.

I shall now recur to the principal facts out of which this suit arose. On August 19, 1879, Stuart and Hauser purchased from one Levi Allen an undivided one-fourth interest in said Peacock

and White Monument mining claims for $1,500, each paying one-half of the purchase price, and the title was taken in the name of Hauser. On November 23, 1880, they jointly purchased from said Allen a further one-fourth interest in said two mining claims and a one-half interest in said Helena claim for the sum of $2,500, each paying one-half thereof, and the title was taken in both jointly. The quitclaim deed conveying said interest by mistake called for a one-half interest in the Peacock and White Monument claims, whereas it should have called for only one-fourth interest therein, as the grantor, Allen, at that time only owned one-fourth interest. Allen having thereafter purchased a three-sixteenths interest in said claims, and learning of the mistake, sought at divers times to have Stuart and Hauser correct it by reconveying to him a one-fourth interest in said Peacock and White Monument claims, or to purchase his after-acquired three-sixteenths interest therein, which they neglected, if not refused, to do, and that matter was not adjusted until after Allen had brought an action to correct said quitclaim deed in 1891. In 1891 one A. M. Holter purchased said three-sixteenths interest from Allen for $10,000. Thereupon said suit was dismissed. On December 5, 1881, Stuart and Hauser purchased from Allen a further one-sixteenth interest in said claims for $1,000, each paying one-half thereof, and the title was taken in Hauser. Thereafter, on June 2, 1882, they purchased an undivided two-sixteenths interest in said claims from I. I. Lewis for $100, each paying one-half thereof, and the title was conveyed to Hauser for their joint benefit.

It appears from the conveyances above referred to that under and by the four several purchases above set out that Stuart and Hauser had become the owners of fifteen-sixteenths of the Peacock and White Monument and eleven-sixteenths of the Helena claims. But it was conceded on the trial that because of the error in said quitclaim deed there had been conveyed to them an undivided one-fourth of the Peacock and White Monument claims more than they had purchased. And it was stipulated on the trial that prior to August, 1890, they had become the owner of eleven-sixteenths of each of said mining claims, and

no more.· It is shown by said deeds that the title to one-fourth of the said Peacock and White Monument claims was taken in the names of Stuart and Hauser, and eleven-sixteenths thereof in the name of Hauser. Hauser held a power of attorney from Stuart authorizing him to sell and convey his interest in said claims. On or about the tenth day of December, 1881, Hauser sold an undivided one-sixteenth interest in said mining claims to A. M. Holter for $300, he having paid Allen $1,000 for a one-sixteenth interest therein five days before the sale to Holter; but said one-sixteenth interest was not conveyed to Holter until the year 1891, at which time Holter and Hauser equalized their interest in said mining claims. On October 19, 1886, Hauser sold and conveyed to Albert Kleinschmidt an undivided four-sixteenths interest in said mining claims for $10,000, taking his promissory note therefor, and on January 21, 1887, he sold to said Kleinschmidt a further three-sixteenths interest in said mining claims for $11,250, and took his promissory notes therefor—one for $7,500 and one for $3,750. The deeds conveying said interests so sold to Kleinschmidt were executed by Hauser in his own name, and not as attorney in fact for Stuart. Said promissory notes were discounted by said First National Bank at the request of Hauser, and the proceeds, $20,600, placed to his credit. It also appears that there was paid on said promissory notes, both principal and interest, $23,034.48. Hauser testified in regard to the buying and selling of their interests in said mining claims as follows: "I purchased at my discretion and sold at my discretion." Stuart testified that at the time he executed the instrument in question he had no knowledge whatever of said sales to Kleinschmidt and Holter, and that there had been no settlement between him and Hauser of the proceeds thereof, while Hauser testified that he had placed to Stuart's credit in said bank one-half of the proceeds of the sale to Holter (the books of said bank corroborated Hauser on this point), and settled in full, and paid Stuart one-half of the proceeds of the sales to Kleinschmidt at the time the instrument in controversy was executed.

The reason Hauser gave for having held the proceeds of the sales to Kleinschmidt for nearly four years was that he did it

to protect the property; that, as Stuart was largely indebted to said bank, had he placed it to his credit therein it would have been applied on his debts; that Stuart did not ask him either to distribute it or place it to his credit in the bank. Hauser testified that he informed Stuart of the sales to Kleinschmidt, and gave him a memorandum of said sales setting forth what he had received therefor, and that on the settlement made at the time the deed in controversy was executed Stuart delivered to him said memorandum, which was offered and received in evidence on the trial. Said memorandum is in the handwriting of Hauser, signed by him, and bears date February 8, 1887, and is as follows:

"Helena, February 8th, '87.

"Dear Sir: Have sold to Albert Kleinschmidt seven-sixteenths of the Peacock, Helena and White Monument copper lodes for $21,250.00, payable in six and twelve months—also for a further consideration of $5,000.00 to be paid from net proceeds. I hereby agree to turn over to Granville Stuart one-half of the net proceeds of the above.

"S. T. HAUSER."

It appears that Stuart was largely indebted to said bank, and in the spring and summer of 1890 the comptroller of the currency was dissatisfied on account of the said bank carrying such a large amount of unsecured paper. Hauser informed Stuart of that fact, and inquired of him what property he owned upon which he could secure his indebtedness due said bank. Stuart informed him of what property he had, and also that he would mortgage all he possessed to secure the payment of his said indebtedness. Hauser thereupon suggested that, to put the matter in better shape, and take up a $37,033 note due the bank, he execute one note for $12,500, another for $12,533, and secure their payment by executing a mortgage on appellant's Montana property; and at that point occurs the conflict in the evidence. The evidence on behalf of Stuart shows that Hauser then suggested that appellant draw on him for the remaining $12,000 of said $37,033, and to secure him, give him a mortgage on appellant's interest in the said Idaho mining claims. Appellant testified

that he agreed to turn over everything he possessed as security, and that a deed was not mentioned, but that a mortgage was; that he then executed two notes—one for $12,500 and one for $12,533—and to secure their payment executed a mortgage on his Montana property to A. K. Barbour, as trustee; that the first intimation he had that the instrument to secure the drafts on Hauser for $12,000 was to be a deed was when he received it by mail from Bullard on the twenty-eighth day of August, 1890; that that was the first intimation he had that the instrument was to be a deed. Stuart testified that after receiving the deed he looked at it, and in consideration of his association with Hauser and the confidence he had in him, he signed it, but did not return it to Bullard until some time after. It was executed on September 4, 1890, and about the middle of that month, 1890, Stuart removed from the cattle ranch to Butte, Montana, and brought the deed with him. About the 6th of October, 1890, he received a letter from said First National Bank, inclosing two notes—one for $12,500 and one for $12,533—and a mortgage securing their payment on property in Deer Lodge, Lewis and Clarke, and Jefferson counties, to be executed by Stuart. The mortgage ran to A. K. Barbour, trustee, and was executed and notes signed by Stuart and returned to the bank. Accompanying said mortgage and notes were two drafts on Hauser for $6,000, each of which Stuart was to and did sign and return to Bullard. Stuart also returned the deed to Bullard on or about the tenth day of October, 1890, with the following letter:

"West Galena St., Butte, Montana, October 10, 1890.
"Massena Bullard, Helena, Montana.

"Dear Sir: When I came to look into my grip for the deed of all my interest in the Idaho lodes it was not there. I had left it here, so had to wait until my return. I now inclose it. Trusting that the delay has not inconvenienced you or Mr. Hauser, I remain,     Yours truly,
"GRANVILLE STUART."

Nothing is said in said letter about said instrument being a mortgage instead of a deed, but calls the instrument a deed.

Appellant, Stuart, testifies that said deed was intended as a mortgage to secure the payment of said drafts, and nothing

more.   In corroboration of Stuart's testimony, R. H. Klein-schmidt and Lucien Eaves both testified that Hauser informed them that Stuart still had an interest with him in said mines. Hauser denies having told them so, and produced several wit-nesses who impeached said Kleinschmidt and Eaves.   The trial court evidently gave no weight to the testimony of Kleinschmidt and Eaves, and as that court met said witnesses face to face, saw their demeanor on the stand and heard them testify, and is therefore better able to judge of the weight to be given to all of that testimony than this court, we are unable to say that the court erred in that matter.

The respondent Hauser testified, among other things, that the negotiations between him and appellant that led up to the execution of said deed were commenced a month or two before its execution; that appellant owed the Davis estate, or the Davis Bank at Butte, Montana, about $75,000, and the First National Bank of Helena about $40,000, and he wanted an extension of time in which to make payment, and respondent informed him that if he could make a payment he (Hauser) could get the bank to extend the time of payment on the balance, and then ap-pellant would not have any trouble with the Davis estate, as that estate and Hauser owned nearly all of the bank, and that to enable the appellant to make a payment on his said indebtedness he (Hauser) would purchase his interest in the Idaho mines at the same rate that he could purchase a three-sixteenths interest from Allen; that he had given appellant a receipt showing the sales to Kleinschmidt and the amount received thereon, and that, if appellant would return home to Ft. McGinnis, and bring said receipt, they would have a general settlement, and that he would pay appellant $4,500 for his three thirty-seconds interest in said mines; that appellant thereupon went home, and returned with said receipt, and thereupon they had a general settlement, and it was ascertained that Stuart owed Hauser $2,750; that Hauser owed Stuart on the sales to Kleinschmidt $10,600, which with the $4,500 agreed to be paid for Stuart's interest in said mines, made $15,100, from which was deducted the $2,750, leaving a balance due Stuart of $12,350, and to settle which Stuart drew said two drafts on Hauser for $6,000 each on October 6, 1890.

Hauser also testified that he threw off about $3,000 interest due on said $37,033 note. It also appears that Hauser held all of the purchase price paid by Kleinschmidt for seven-sixteenths of said mining claims for over three years, amounting to $21,250,. one-half of which, $10,625, belonged to Stuart. And Hauser testified that the interest he "knocked off" of the $37,033 note of Stuart's more than counterbalanced the interest on Stuart's one-half of the Kleinschmidt's notes. He also testified that in the settlement between himself and Stuart he took into consideration the amount of $3,000 which Kleinschmidt claimed said mining claims owed him, and Stuart's one-half of that was $1,500; that he had advanced $1,600 in connection with said mines, and Stuart's part of that was $800; that he had paid Stuart between the time of the first meeting and the settlement about $450, and the $12,000 represented by the drafts was the difference between them due Stuart; that that was the settlement in round numbers, and Stuart was to give him a deed to his interest in said mining claims, and return him his receipts here- tofore given Stuart. The receipts were: returned, and the deed in question executed. That is substantially the testimony of Hauser upon that point. The evidence on the part of Hauser shows that he paid all taxes assessed against said interest in said mining claims, paid Stuart's drafts to the amount of $450,. paid Kleinschmidt $3,000, and other items of expense connected with. said mining claims, and that all of said matters were · settled in the acceptance by Hauser of the drafts for $12,000 and the execution of said deed to Hauser by Stuart.

In the oral arguments, as well as in the briefs of counsel, con- siderable has been said in regard to the drawing of said drafts. and the renewal of them by Stuart; and it is contended by coun- sel·for appellant that said drafts have not been paid, and that Stuart is still liable for their payment. There is nothing in. this contention, as the evidence shows Hauser made a compro-· mise settlement with the receiver of said bank, under an order. of the court having jurisdiction thereof, of more than $400,000· of his indebtedness to said bank, in which was included said drafts,: and the receiver testified that said drafts were surren-; dered by the bank to Hauser under said compromise settlement.,

It is also contended by counsel for appellant that Hauser was the First National Bank of Helena, and there is evidence from which that conclusion might reasonably be drawn. If it be true that Hauser compromised his indebtedness with the bank, it is not shown that appellant was injured thereby, and, if Hauser was the owner of the bank, no one was hurt but Hauser. Hauser settled those drafts, and the drafts were delivered to him by the receiver, and were marked "Paid by Hauser." Wilson, as bank examiner, as early as 1893 classified said drafts as Hauser's. The receiver also testified that prior to his getting information from Mr. Walsh (one of the attorneys for the appellant) he had never heard that Stuart was liable on said drafts. The receiver also testified that the compromise with Hauser was effected and the drafts included therein in 1897, some three years before the commencement of this action. The moment Hauser accepted those drafts they became his debt instead of Stuart's, and Stuart was released therefrom when time for protest had passed and no protest made. They were not protested; hence Stuart's liability ceased years before this suit was brought.

It is contended that, as Stuart renewed said drafts, that fact was at least a circumstance in support of his contention that they remained his debt. Hauser swears positively that the drafts were so drawn and renewed at his request, and not for the purpose of holding Stuart thereon as the debtor, but for Hauser's accommodation. It is evident that the bank did not consider Stuart in any manner liable for the payment of said drafts, as it never demanded payment from him. The receiver himself testified that, prior to being informed by counsel for appellant, he did not know that Stuart was liable on said drafts. The record fails to disclose the fact that appellant ever inquired about or took any interest in the payment of said drafts or the interest thereon from 1890 to 1900—for a period of about ten years.

Appellant kept an account at said bank—and from 1879 to 1890—the latter being the year when the instrument in controversy was executed—and during that period of time various items of taxes, expenses in the development of said mines, etc., were charged up to the account of appellant, but subsequent to

September 4, 1890, no such expenses were charged to his account. And it was testified by Albert Kleinschmidt that "the record of Mr. Stuart's account at said bank would not have been any different had the payment [of said $12,000] been in cash." It is thus shown that $12,000 of Stuart's liability to said bank was transferred to Hauser, and, as shown by the record, Stuart was released entirely from all obligation on such liability. While technically he might have been held under proper protest of said drafts, the evidence shows that the drafts were not protested, and he has been as effectually released from all liability thereon as he would or could have been had Hauser paid said drafts in cash. The fact that Hauser finally settled those drafts and other of his indebtedness by compromise and discount makes no difference. As to the drafts, they were accepted by Hauser, who thereupon became the principal debtor. In that transaction Stuart's relation was changed from principal debtor to surety. While it is true he renewed said drafts at two different times, it was done at the instance and request of Hauser, and it appears from the record that during all of those years between September 4, 1890, to 1900, he never made any inquiry either in regard to said drafts or the Idaho mining claims, an interest in which he had conveyed to Hauser by the instrument in controversy. There are these and other circumstances supporting the theory that said instrument was an absolute deed. While the record contains facts and circumstances that indicate the instrument was only intended as a mortgage, yet we are unable to say that the trial court did not arrive at a correct conclusion from the conflicting evidence in the case.

If there was no settlement between appellant and Hauser, according to the evidence, Hauser would be owing appellant several thousand dollars on the sales to Kleinschmidt; and surely appellant knew of these sales, and being hard pressed during those years to pay his debts, according to his own testimony, he never asked Hauser to settle and pay him what was due him on those sales. Evidently those drafts were considered by him as claims against Hauser exclusively and the transaction of executing the deed in question had passed out of his mind until Kleinschmidt advised him to bring this suit. The bank

rendered him statements of the condition of his Montana property mortgaged to it, and of the amounts paid in the debt secured thereby; but not one letter or word passed between appellant and Hauser in regard to said drafts or the Idaho mines, although Hauser had paid taxes and other expenditures thereon. He now claims that said mines were worth at least half a million dollars in September, 1890, and that he knew it at that time, and has let the matter quietly rest for more than nine years, and was hard pressed with debts during all that time. If that be true, it is most unfortunate that he has not sufficient evidence to clearly establish the main issue in this case. The circumstances are against him.

It is also contended that because of the social, political, and business relations between Stuart and Hauser the latter exercised an unusual influence over the former, and because of such relationship and influence the court should require proof from Hauser that said transaction was fair and honest in all respects. The trial court found from the evidence as a fact that said Hauser "did not at any time exercise any unusual influence over Stuart." We think that finding is fully sustained by the evidence. While the record shows the relationship between them was friendly, socially, politically, and in business matters, it does not show that Hauser exercised any unusual influence over him. The record shows that appellant is a man possessed of much more than ordinary mental endowments and business capacity. He has had large experience in banking, mining, and in conducting a large business in buying, selling, and raising livestock, and was the duly appointed, qualified, and acting envoy extraordinary and minister plenipotentiary of the United States to the republics of Uraguay and Paraguay for a term of four years. The latter position he held after the execution of the instrument in controversy. We cite those facts to show that Stuart was a man of large and varied business experience, and a man of more than ordinary mental power and business ability. The evidence does not show that Hauser had acquired a superior influence or advantage over him, and for that reason the rule contended for by counsel for appellant is not applicable to the facts of the case. Counsel also contend that the great

inadequacy of price claimed to have been paid by Hauser for said three thirty-seconds interest is a circumstance tending strongly to show that the deed was intended as a mortgage. Four witnesses testified and gave their opinions of the value of said mining claims at the time said deed was executed. Their opinions of the value range from $500,000 to more than $1,500,-000. The testimony of the experts, if they may be so called, as to the value of said mines, is merely speculative, and should not be given much weight, when considered with the evidence showing how the parties themselves valued those mines as shown by actual sales made. The record shows that Stuart and Hauser purchased from Allen, who was one of the original locators, and knew the value thereof, a one-fourth interest in the Peacock and White Monument claims in the year 1879 for $1,500. On November 23, 1880, they purchased a one-fourth interest of the Peacock and White Monument and a one-half interest in the Helena for $2,500. In December, 1881, they purchased a one-sixteenth interest in said three claims for $1,000. In June, 1882, they purchased a one-eighth interest therein for $100. In February, 1881, Lewis, one of the original locators, sold Allen a one-fourth interest in said claims for $1,000. In October, 1886, Hauser sold a fourth interest for $10,000, and during the same month Lewis sold a one-eighth interest for $5,000. In January, 1887, Hauser sold a three-sixteenths interest for $11,250, and in September, 1891, said Allen sold a three-sixteenths interest for $10,000.

It will thus be seen that for a period of ten years before the execution of this instrument in controversy and one year after, numerous sales were made, and the prices paid ranged from $100 for a one-eighth interest to $11,250 for a three-sixteenths interest. Those facts are more reliable as to the true value of said claims than the opinion testimony of witnesses ten years after the date of the transaction which resulted in the execution of the deed in controversy. The highest value for which a three thirty-seconds interest sold was $5,625. We cannot say that the price claimed to have been paid by Hauser for Stuart's three thirty-seconds, to wit, $4,500, was so grossly inadequate as to justify a court in declaring said deed to be a mortgage in

the face of the conflicting evidence given on the trial. There is a most substantial conflict in the testimony touching the question whether said deed was intended as a mortgage. But it is contended by counsel for appellant that in a suit in equity the rule that the appellate court will not disturb the judgment when there is a substantial conflict in the evidence does not obtain or apply in this suit. We might concede that contention if the case were submitted to the trial court wholly upon depositions and record evidence; but where witnesses are produced, and give oral testimony, and, as in this case, where the main issues are sought to be established by oral evidence, the rule that, where there is a substantial conflict in evidence, the appellate court will not disturb the judgment, is as applicable to suits in equity as in actions at law. In *Commercial Bank v. Lieuallen,* 5 Idaho, 47, 46 Pac. 1020, which was a suit in equity, this court held that where there was a substantial conflict in the evidence, the facts found by the trial court would not be disturbed. To the same effect, see, *Brison v. Brison,* 90 Cal. 323, 27 Pac. 189; *Sullivan v. Moorehead,* 99 Cal. 157, 33 Pac. 797; *Mahoney v. Bostwick,* 96 Cal. 53, 31 Am. St. Rep. 175, 30 Pac. 1020. In *Doe v. Vallejo,* 29 Cal. 391, the supreme court of California completely answered the contention of counsel for appellant on the point under consideration. That was a suit in equity to foreclose a mortgage. The court said: "It is insisted that, this being an equity case, the court will not apply the same rule with reference to balancing conflicting testimony which it would if the appeal was from an order denying a new trial in an action at law; that the court will determine the question of fact upon an examination of all the evidence as if they had never been determined in the court below. We had supposed that this court had so often declined to make any distinction in practice between cases at law and cases in equity that the question might be considered settled. Our system does not contemplate any distinction in this respect, and there is no propriety in making any under it. . . . . The witnesses were examined in open court, and only brief minutes of testimony taken as in actions at law. The record is brought to this court by statement on motion for a new trial in the same manner as

in actions at law. The court below is possessed of all those aids necessary to enable it to give due credit to every item of testimony which are accessible to the judge who tries an action at law, and which, from the nature of things, are inaccessible to this court." The authorities supporting the above views are numerous, but it is unnecessary for us to cite others. The rule above referred to is well established by the decisions of all code states that we have examined, where the distinction between actions at law and suits in equity has been abolished.

While on the witness-stand, the appellant was asked what information, if any, he had concerning the value of said mining claims, and he replied that he and Albert Kleinschmidt had had occasional conversations about the matter. He was then asked this question: "Now, Mr. Stuart, from such information as you are able to gather concerning the value of this property, I wish you would state to the court what, in your opinion, was the value of the property at the time of the execution of this deed in the year 1890." The question was objected to on the ground that the witness had not shown himself competent to testify as to the value, and that he ought not to be permitted to state what he thought the value was from information derived from others; which objection was sustained by the court, and that ruling is assigned as error. We do not think the court erred in excluding the answer to the above question, for the reason that the question did not confine the witness to information received prior to the execution of said deed, for an opinion formed from information acquired by the witness after the execution of said deed was wholly irrelevant and immaterial. Any proper evidence to show what the witness believed the value of that property to have been at the date of the execution of said deed was proper, but an opinion formed from information received subsequent to the execution of said deed was immaterial.

The witness Drake was not permitted to testify as to the amount he had offered Kleinschmidt for his interest in said claims. That action of the court is assigned as error. That testimony was wholly irrelevant, and properly rejected.

The witness Holter was permitted to testify over the objection of counsel in regard to his having purchased a one-sixteenth interest in said mines. That action of the court is assigned as error. We are unable to see how the testimony was relevant to the issues, and we do not see how its admission affected any substantial right of the appellant.

We have considered the other errors assigned, and not specially referred to in this opinion, and find no prejudical error in the record.

The judgment must be affirmed, and it is so ordered. Costs of this appeal are awarded to the respondents.

Stockslager, J., concurs.

AILSHIE, J., Dissenting.—I am unable to concur in the conclusions reached by a majority of the court in this case. After repeated examinations of the voluminous record in the case, I am fully convinced that one of the closest, confidential, and fiduciary relations which can ordinarily be established has been proven to exist between Stuart and Hauser for a period of more than thirty years. When such a relation is shown to exist between vendor and vendee at the time the deed claimed to be a mortgage was executed, the rule laid down in *Coyle v. Davis,* 116 U. S. 583, 6 Sup. Ct. Rep. 314, 29 L. ed. 583, and supported by authorities from all the states, that the evidence to show it was intended as a mortgage "must be clear, unequivocal, and convincing," does not apply. Where men deal with each other in the ordinary business affairs of life, with no special or specific relation of trust or confidence existing between them which would necessarily and unavoidably tend to the inevitable result of relaxing their ordinary business methods and caution, it is an equitable rule, well established, that he who questions his deed of conveyance must establish his charge by evidence clear and satisfactory. It seems to me that in equity and good conscience this rule should be relaxed proportionately as the relation of trust and confidence is shown to exist in each case. Equity lays down no invioable rules and precedents, but meets each case as it finds the facts therein, and deals out justice ir-

respective of forms and precedents. It was for this identical purpose that the rule was established of admitting parol evidence in such cases as the one under consideration. In this case there is a substantial conflict in parts of the evidence, but I am unable to find anything which could be termed a conflict in the evidence as to the relation which has continuously existed between appellant and respondent Hauser, since the year 1862. I shall enumerate some facts which appear from the record, in addition to those contained in the opinion of the chief justice.

Hauser was, practically, the First National Bank of Helena, which institution was organized in 1866. Hauser was in absolute control of the business and management of the bank from its organization until its failure in 1893. In 1866 Stuart began working in the bank as bookkeeper, which position he held for more than three years. In 1878 Hauser caused ten shares of the capital stock of said bank to be transferred to Stuart, and thereupon Stuart was made a director of the bank; which position he held until 1894. Stuart never owned the stock, and when he ceased to be a director transferred the same back to Hauser. Stuart had an open account with the bank from 1878 to 1895. From 1863 down to 1895 or 1896 Stuart and Hauser were interested together in numerous mining companies, and during a part of that time in the cattle business Stuart being the general manager on the ranges. About 1883 Stuart purchased Hauser's interest in the cattle business, and became heavily involved, and from that time on was financially at the mercy of Hauser, the individual, and the First National Bank, which was one of Hauser's multitudinous corporate names. From about the year 1886 down to 1890 we find Stuart writing Hauser most pathetic letters of his financial distress and need, and drawing on Hauser for such sums as $100, and Hauser, while he has in his hands $10,600 belonging to Stuart from the sale of an interest in these Idaho mining properties to Kleinschmidt, honors the drafts for these pittances. Part of the $10,600 was received by Hauser in October, 1886, and the remainder in January, 1887, during the severe winter in which Stuart lost so many cattle and was having his hardest struggles to maintain his business. Hauser holds this entire sum until

October, 1890. On July 13, 1890, in answer to one of Stuart's appealing letters, Hauser writes: "Yours in reference to Davis, having cut you off received. As I understand it, we are going to quit entirely. If we go on we will continue, but let the matter rest until I return. In the meantime, if you need any money, draw on me from time to time, for one or two hundred as you need it. You ain't flat broke, nor won't be unless I have very bad luck. You have some money that you don't know anything about. Yours, S. T. Hauser." It would seem from this letter that Stuart knew nothing at this time of the Kleinschmidt sales, and that he was not aware that Hauser had $10,600 to his credit. During these years, Hauser, the individual, was doing a business which involved the expenditure of an average of from $1,000,000 to $1,500,000 annually. He was the controlling spirit in numerous banks, organized so many mining corporations that he says on the witness-stand, "It would take all the evening for me to tell you all the mining companies I have been connected with." He built ten or twelve branch lines of railroads in the territory of Montana, eight of them being branches of the Northern Pacific Railroad. In 1863 plaintiff and his brother James were partners, and in that year the brother loaned Hauser $1,000, with which he went to St. Louis and organized the first mining corporation of Montana. During all this time Stuart was either working for Hauser or associated with him in some of his enterprises, and invariably looking to Hauser to float the financial end of the business. Both were of the same political faith, and prominent in the politics of the territory. Hauser was appointed governor of the territory by President Cleveland, and served eighteen months, when he resigned to continue the prosecution of his gigantic business enterprises. On October, 6, 1890, the date on which the first two drafts for $6,000 each were drawn, Hauser had in his bank $135,769.23 to his individual credit. Stuart, while on the witness-stand, was evidently asked why he did not take an agreement from Hauser to reconvey these mining claims if this deed was only intended as security. He testifies: "As I still owed the debt, it was a poor time to talk about reconveyance. I understood the property was to revert to me upon the payment of

the debt." This, it seems to me, is expressive of Stuart's condition at that time. He was then indebted to Hauser, dealing as the First National Bank, $37,033, and was absolutely dependent upon Hauser.

It should also be observed that on May 20, 1882, plaintiff and his wife executed and delivered to Hauser a power of attorney authorizing him to sell, bond, or in any manner dispose of any and all mining claims held by him in the territory of Idaho, or which he might thereafter acquire, and to maintain or defend any and all actions in relation thereto. This power of attorney was held all these years by Hauser and never revoked. To further illustrate the implicit confidence Stuart had in Hauser, it is shown that on April 2, 1894, and only one day before plaintiff started on his official mission to Montevideo, South America, he and his wife executed and delivered to Hauser a further power of attorney authorizing him to demand, sue for, and receive any and all sums of money which were then due or might become due to plaintiff "in the United States of America," and to dispose of real and personal property in the state of Montana, and apply for and receive patents to mining claims, and represent him at stockholders' meetings, etc. It also appears that all the negotiations of every kind, both in purchasing and selling the Idaho mining properties, were by Hauser, and that Stuart knew nothing of what was going on in relation thereto; that Stuart's account at the bank was charged from time to time as any interest was acquired or expense incurred, and that, as a matter of fact, Stuart seldom knew how his account stood, and after the transaction of October 6, 1890, we find him writing to know if an item of $854.11 was included in the notes, and saying, if not, to send him a note to cover that and he would sign and return it. In 1895, and while Stuart was in South America, all his interest in the cattle company was sold for $35,000, and his indebtedness to the Davis estate and one of the $12,000 notes were paid, and the other reduced to some $3,000. I recite these facts for the purpose of showing the intimate relation of trust and confidence existing between these men and the commanding position occupied by Hauser over Stuart.

The ordinary and average relation between brothers is much surpassed by that existing between Stuart and Hauser, as is disclosed by this record.

As said by Judge Brewer in *Keith v. Kellam* (C. C.), 35 Fed. 245; "It will not do to separate these different transactions, and say that no one of them by itself was sufficient to establish a confidential relation. . . . . The only fair way to look at it is to take all these transactions in the aggregate, and determine therefrom how each must have regarded the other." The lord chancellor, in *Vernon v. Bethel,* 2 Eden, 110, stated the principle, which is just as applicable to-day as it was then, when he said: "Necessitous men are not, truly speaking, free men; but, to answer a present emergency, will submit to any terms that the crafty may impose upon them." In *Lindsay v. Lindsay,* 1 Colo. App. 108, 27 Pac. 877, the supreme court of Colorado, in discussing the burden of proof in such cases as this, said: "Whenever the transaction is between parties whose relations are of a close fiduciary character, the complainant is not held to the same exactitude and strictness of proof, nor is the testimony offered in support of the bill to be viewed with the same scrutiny, as in those cases where the parties deal with each other at arm's length." In discussing the same principle of equity the supreme court of Missouri, in *O'Neill v. Capelle,* 62 Mo. 202, said: "Courts of equity watch transactions of this sort with such jealous and ever-vigilant solicitude that, if the matter be in doubt, they will desolve that doubt in favor of the theory of a mortgage, and compel the transaction to assume and wear that hue and complexion." (*City of Kansas City v. Zahner,* 138 Mo. 453, 40 S. W. 103; *Kyle v. Perdue,* 95 Ala. 579, 10 South, 103; *Waddell v. Lanier,* 62 Ala. 347; *Villa v. Rodreguez,* 12 Wall. 339, 20 L. ed. 406.) In 2 Pomeroy's Equity Jurisprudence, 479, the author lays down the rule as to the proof required in cases like this. He says: "Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person

so availing himself of his position will not be permitted to re-
tain the advantage, although the transaction could not have
been impeached if no such confidential relation had existed."
(See *Russell v. Southard*, 53 U. S. 139, 13 L. ed. 927, where
many questions arising in this case are discussed.)   In speaking
of trustees, agents, etc., the New Jersey chancery court says:
"Such transactions are never upheld unless it is clearly shown
that there has been on the part of the person trusted that most
marked integrity—that *uberrima fides*—which removes all
doubt respecting the fairness of the contract." (*Porter v.
Woodruff*, 36 N. J. Eq. 179; 1 Story's Equity Jurisprudence,
secs. 217, 323; Perry on Trusts, secs. 170, 194; *Tappan v.
Aylsworth*, 13 R. I. 582.)   After a careful examination of the
authorities bearing on this question, I am of the opinion that as
soon as plaintiff established the close relation of confidence and
trust which the record discloses in this case, equity will at once
relax the rule of strict proof, if not entirely shift the burden
onto the defendant of showing that his deed was in fact intended
to pass the title absolute.   Where such relation is shown, and
the evidence as to the purpose for which the conveyance was
made leaves the court, acting as a chancellor, in doubt, it seems
to me that the equitable and more conscionable rule is to hold
the instrument to have been intended as security, and thereby
save harmless both debtor and creditor.   Entertaining this view
of the case, I think the evidence overwhelming in favor of the
appellant, and that the rule often announced by this court in
cases of a substantial conflict in the evidence does not apply
here.

But there is another and equally serious question in this
case.   Respondent contends that appellant's note for $37,033,
held by the bank, was paid October 16, 1890, by Stuart giving
the two notes for $12,500 each, secured by mortgage on all his
Montana property, and the two drafts for $6,000 each, which
were accepted by Hauser, and that these two accepted drafts
covered the purchase price of the Idaho mining property.   The
note itself bears indorsements as follows: "Oct. 16, '90, $12,000
paid by ecc of S. T. Hauser, $25,033.00 paid by A. K. Bar-
bour."   This note was never surrendered to Stuart, and when

he wrote for it the bank informed him that it was held by A. K. Barbour as a voucher. The first two drafts for $6,000 each were drawn October 6, 1890, one payable six months after date and the other payable seven months after date. The second two drafts for $6,660 each, covering interest from date of first settlement, were drawn August 31, 1892; one payable six months after date, the other eight months after date. The third and last two for $6,600 each were drawn April 2, 1894, the day before Stuart started for South America, each payable eighteen months after date. From these facts it will be seen that a period of five years from October 6, 1890, Stuart's indebtedness continued both to Hauser the individual and Hauser the bank, and as between Stuart and Hauser the indebtedness has never been discharged. It is true the form and evidence of the indebtedness was changed, but this only suspended the remedy by the creditor, and in no respect paid the debt. Not being paid when due, the remedy on the original note revived, and the debt never was extinguished. (*Welch v. Alington,* 23 Cal. 322; *Brown v. Olmsted,* 50 Cal. 162; *Tolman v. Smith,* 85 Cal. 280, 24 Pac. 743; 18 Am. & Eng. Ency. of Law, 167; *Comptoir D'Escompte de Paris v. Dresbach,* 78 Cal. 15, 20 Pac. 28.) It is clear to my mind that the pre-existing indebtedness for which it is claimed this deed was given was not paid, extinguished or canceled at the time of the execution of the deed, nor for more than five years thereafter, and that protest for that period was unnecessary on the part of the bank to hold Stuart, the drafts not yet being due. Chief Justice Post, speaking for the court, in *Riley v. Starr,* 48 Neb. 243, 67 N. W. 187, announces what seems to me the chief and crucial test to be applied in ascertaining whether the instrument was intended to secure a debt or vest the title. He says: "A safe, and perhaps the most satisfactory, test in all such cases is whether the relation of the parties to each other as debtor and creditor continues. If it does, the transaction will be treated as a mortgage; otherwise not." This question has repeatedly been discussed and held to be a pivotal point in cases of this kind. (*City of Kansas City v. Zahner,* 138 Mo. 453, 40 S. W. 103; *Campbell v. Dearborn,* 109 Mass. 130, 12 Am. Rep. 671; Pingree

on Mortgages, sec. 116.) In 20 American and English Encyclopedia of Law, second edition, at page 944, this principle is announced in the text, and the authorities are collated in the note.

My associates lay stress on the fact that these drafts were never protested, and that eventually, in 1901, Hauser compromised with the receiver of the bank, and settled them, and that Stuart was never called upon to pay them. I am unable to see the force in such contention. It seems to me that the question is, Was the debt paid and extinguished when the deed was executed and delivered? If it was not, how can the creditor thereafter—one month, five years, or, as in this case, eleven years—cancel the obligation, and say that his debtor owes him nothing, and thereby convert the conveyance which was intended as security for the debt into a sale absolute of the property covered by the deed? The proposition, "once a mortgage, always a mortgage," has become a legal maxim in this country, and the test is, What became of the debt at the time the deed was executed? (20 Am. & Eng. Ency. of Law, 2d ed., 951; *Tower v. Fetz*, 26 Neb. 706, 18 Am. St. Rep. 795, 42 N. W. 884; *Macauley v. Smith*, 132 N. Y. 524, 30 N. E. 997; *Lounsbury v. Norton*, 59 Conn. 170, 22 Atl. 153; *Murry v. Walker*, 31 N. Y. 401; *Riley v. Starr*, 48 Neb. 243, 67 N. W. 187; *State Bank v. Mathews*, 45 Neb. 659, 50 Am. St. Rep. 565, 63 N. W. 930; *Odenbaugh v. Bradford*, 67 Pa. St. 104; *Rankin v. Mortimere*, 7 Watts, 375.) Hauser attempts to explain these drafts by saying, "I wanted Mr. Stuart's name on this paper for the accommodation it might be to me." It is at least significant, when we remember that this is all a part of the one transaction, to contend in one breath that these parties were dealing at arm's length, and that the original debt was paid by executing a deed, and in the next breath to say that Hauser the individual borrowed from Hauser the bank the money with which to pay for this deed, and at the very same time procured the vendor to draw on him as an "accommodation," and still failed to pay the drafts when due. If it was not intended to continue the debt in existence, why did Hauser not pay these drafts out of the $136,000 he then had in the bank to his credit?

Hauser further explains this by saying that he had borrowed of the bank up to the limit allowed by law to be loaned by a national bank to any one person, and that this method was adopted "to kind of fool the comptroller." Were it not for the statute of limitations, I apprehend that Governor Hauser would not have made this admission in face of the acts of Congress governing officers of national banks. To say the least of this, to my mind it does not support the proposition for which it was evidently given; and, furthermore, we do not find in this record Stuart at any time trying "to kind of fool" anybody. The fact that Stuart waited ten years before demanding his rights in this case is urged to his detriment, and at the same time the fact that eleven years after the first drafts were drawn they were compromised, settled, and canceled by Hauser is cited with approval, and to establish the fact that the debt was actually liquidated. Stuart certainly makes a reasonable explanation of the matter. He had been absent four years. During the entire ten years Hauser had held powers of attorney to do as he pleased with Stuart's property. Nothing came to Stuart's knowledge of any deals or transactions affecting these mining properties until Hauser and Holter commenced a partition suit against their co-owners for a sale of the claims and distribution of the proceeds. Stuart says: "As I was not mentioned in the partition suit, it became evident at once that I was left out, as it were; and it occurred to me that it was time l was taking steps to assert my rights, which I proceeded to do." It is reasonable to believe that Stuart was lured on by the same confidence in the fair treatment he would receive from Hauser, which had been growing for forty years, and which had caused him to leave in Hauser's hands a general power of attorney to dispose of this property since 1882. The greater portion of this property had stood on the record in the name of Hauser since 1879. Why, then, should the plaintiff lose his property because he continues to trust the man with whom he had dealt so many years.

The fact that Stuart is a man of varied business experience, who enjoyed the confidence of his fellow-citizens, and was rec-

ognized by the chief executive of the nation as a fit man to represent this government in a foreign country, is cited to show that, Hauser had no unusual influence over him, and that the relation of trust and confidence therefore did not exist. By this it is certainly not meant that a man must be either ignorant, feeble-, minded, or disreputable before he can repose trust and confidence in another, or be influenced and financially dominated by another; nor do I suppose it is meant that he must be such before he can assert his rights in a court of equity.

I have recited many facts which are not found in the majority opinion by Chief Justice Sullivan in order to illustrate the position I take in this case. In the consideration of the entire case the facts in the majority opinion should be taken in connection with those recited herein.

The foregoing are the principal reasons why I think the judgment of the lower court should be reversed.

## ON REHEARING.

STOCKSLAGER, J.—Counsel for appellants filed their petition for a rehearing, and earnestly urge that the conclusions reached by a majority of the court are erroneous both as to law and facts. The facts are very fully set out in the opinion, and if any were omitted they are shown in the dissenting opinion prepared by Justice Ailshie. For these reasons we deem it unnecessary to further refer to the facts, except as it may become necessary in applying the law to the facts as we understand them.

In the petition it is stated that: "The relationship existing between Stuart and Hauser was one of great confidence; that, in addition to this, Hauser was the trustee for Stuart of the property involved in the controversy. Hauser was also the confidential agent of Stuart in regard to the sale and disposition of his interest in the property for whatever sum or consideration he saw fit to sell it. He held a power of attorney from Mr. Stuart to this effect. So that there are three elements at the outset which are not disputed nor contradicted by any testimony: 1. The relationship of confidence; 2. The relationship of trustee and *cestui que trust;* and 3. The relationship of principal and agent." Our attention is called to the first allegation of

the complaint, which is not denied: "That during all the times in this complaint mentioned, and since long prior thereto, and down to the time of the commencement of this action, this plaintiff, Granville Stuart, and one Samuel T. Hauser were personal friends, between whom there existed the closest relations, social, business, and political, by reason of which this plaintiff, during all the times mentioned in the amended complaint herein, and until the time of the commencement of this action, reposed in the said Samuel T. Hauser the greatest trust and confidence." The record in this case as made by both appellant and respondent certainly supports this allegation, and it would have been bad faith on behalf of respondent to have denied the relationship in his answer—which was verified—and then from the witness-stand relate the facts of a long intimate relationship with appellant. The record discloses, however, that the first allegation of the complaint goes further, and alleges that respondent had exercised over appellant an unusual influence. This part of the allegation is denied in the following language: "Denies that this answering defendant ever at any time exercised over the said plaintiff an unusual influence, or any influence whatever." The plaintiff is not complaining in this action of the existence of an intimate social, business, and political relationship, but that by reason thereof respondent had an unusual influence over him. This part of the allegation we think sufficiently denied in the above-quoted averment of the answer. I think the record in this case abundantly shows that the parties to this action were very close friends, and their actions show the greatest trust and confidence in each other. This may be said of one as well as the other, and covers a period of a great many years, apparently down to the time of the commencement of this action. They were early settlers of Montana, sharing each other's fortunes in many business transactions. It is shown that at the time of the commencement of this action both parties are well advanced in years, and have spent their lives in Montana in active business—mining, cattle business, and banking, etc. It is further shown by the record that either is able to take care of himself in any business transaction, unless it be the one we are now considering.

Now with these facts before us, let us apply the law to which our attention is called in the petition. We have read *State v. Thum,* 6 Idaho, 323, 55 Pac. 858, but do not think the facts in this come within the rule laid down by the majority of the court in that case. There the act complained of was absolutely prohibited by law, and the party committing it was guilty of a felony. In *Ross v. Conway,* 92 Cal. 632, 28 Pac. 785, Mr. Justice Harrison, speaking for the court, says: "The issues before the court were, in substance, whether Mrs. Ross was at the respective dates on which the deeds of trust were executed of weak mind, or able to comprehend the provisions of the instruments, and whether the defendant, Conway, used the influence which he had acquired over her by virtue of being her spiritual adviser for the purpose of procuring her to make such disposition of her property." *Casborne v. Barsham,* 2 Beav. (Eng. Ch.) 78, does not support the contention of appellants. The bill prayed that the deed might be delivered up to be canceled, or that it might be allowed to stand only as a security. The deed had been obtained from Dennis Chandler, by Barsham, who was Chandler's solicitor, etc. The evidence showed that Barsham had great professional influence over his client. This both Barsham and Chandler denied. In passing on this question Lord Langdale said: "The object of the second part of the issue was to ascertain whether Barsham, availing himself of his character of solicitor, had obtained the deed by undue influence, etc. Omitting such transactions as are void by the policy of the law, it is plain that there are transactions in which there is so great an inequality between the transacting parties, so much of habitual exercise of power on the one side and habitual submission on the other, that, without any proof of the exercise of power beyond that which may be inferred from the nature of the transaction itself, this court will impute an exercise of undue influence. . . . . But other cases do not rest solely on the nature of the transaction, and in the fact of habitual or occasional influence it is required to show that some advantage was taken, or that there was some fear, some use of threat or of undue practice or persuasion." *Fitch v.*

*Reiser,* 79 Iowa, 34, 44 N. W. 214, is also cited by appellants. We only quote the syllabus: "A voluntary conveyance by a father of substantially all his property to his daughter will be set aside on the ground of undue influence where it is shown that the weakness of mind of the grantor, who was over eighty years old, was extreme, and that in other business transactions he was wholly controlled by and dependent upon the grantee." *Graham v. Burch,* 44 Minn. 33, 46 N. W. 148, a Minnesota case, is a very similar one. In this case an infirm old man, with impaired faculties, conveyed to his daughter and her infant children his entire estate, to the exclusion of another daughter from any participation in said estate. Held to be the result of undue influence. The case of *Roby v. Colehour,* 135 Ill. 300, 25 N. E. 777, involves the relation of attorney and client. The statement of facts details all the circumstances leading up to the execution of the conveyance to the attorney by the client and the purposes for which it was given. A careful reading of this case discloses a very different situation from the case under consideration. In *Kyle v. Perdue,* 95 Ala. 579, 10 South. 103, the syllabus says: "In this case the instrument assailed by the grantor, an old woman in feeble health, by which she conveyed all her property to the grantees, wealthy men engaged in active business pursuits," etc., does not apply to the case at bar. The case of *Waddell v. Lanier,* 62 Ala. 347, involves a deed executed by an old lady nearly ninety years of age, partially paralyzed, her mind enfeebled, and her body diseased. She executed a deed of all her property to Lanier upon a purely voluntary consideration, etc. The court held that the deed should be set aside. In *Boney v. Hollingsworth,* 23 Ala. 690, a father executed a deed conveying certain lands to his sons, but filed it away among his papers, and never delivered it. After his death the grantees obtained a voluntary relinquishment from their sister of all her interest in the lands by representing to her that their father on his deathbed had declared it to be his intention that they should have them. The relinquishment was set aside in equity because the grantees failed to show that they stated fully and fairly their father's dying declaration. Counsel for appellant says: "I must again reiterate that all these relationships were absolutely ad-

mitted upon the trial of this case to have existed between these parties. Such being the case, we now ask the court to apply these legal principles which are applied everywhere by other courts when such relationships are shown to exist between parties."

It certainly cannot be seriously contended that Mr. Stuart, the appellant, comes within the rule laid down in any of these cases. As I read the record, he is, and for the past thirty years at least has been, a strong, vigorous, business man. The rule sought to be invoked by counsel for appellant applies to parties for some reason disqualified from caring for themselves in business transactions. Courts of equity, in cases of this character, certainly should and do consider the condition of both parties to the transaction complained of as to business capacity, intellect, and any and all reasons that may have prompted the execution of the instrument. As to business capacity and intellect, the record does not disclose that Mr. Hauser had any advantage over Mr. Stuart; and, if the theory of appellant is to be accepted as true, that this property at the time of the execution of the deed was immensely valuable, and such fact was known to Mr. Stuart as well as Mr. Hauser, then there never was a time that Mr. Hauser could take any advantage of Mr. Stuart by reason of his indebtedness to the bank of which Mr. Hauser was president. It would not seem that a man of Mr. Stuart's business capacity and intellect would go to South America expecting to be absent four years, and leave an absolute deed in the hands of Mr. Hauser, conveying to him property of large value, without a written word to show that the deed was intended only as security for an insignificant debt compared to the value of the property, knowing, as he certainly did, that the death of Mr. Hauser would extinguish his equities in the property.

The next question, ably and earnestly urged by counsel for appellant, is the inadequacy of the consideration for which the deed was executed. If there was a settlement between these parties, and the deed was executed, as found by the trial court, for the purpose of extinguishing certain indebtedness from appellant to respondent, and in no sense intended as a security,

then the question of value is unimportant; hence the question arises, Was the court justified by the evidence in such finding? It must be borne in mind that the court will not disturb this finding unless it is apparent from the record that the trial court was wholly unjustifiable in its conclusion; in other words, this court will not reverse a judgment of a trial court on findings based upon conflicting evidence. He had the opportunity of hearing all the evidence, of seeing the witnesses, and should be and is much better prepared to judge who is mistaken or who should be believed than this court. We only have the record, which of necessity is not always complete and does not give every detail of the trial, or all the evidence before the trial court. The original opinion goes into the evidence very extensively, and deals with all the facts in the case; hence it is unnecessary to repeat here. A careful review of the evidence and the new authorities cited does not convince us that a rehearing should be granted.

Rehearing denied.

Sullivan, C. J., concurs.

AILSHIE, J.—I dissent. I still entertain the views in this case expressed in the opinion originally filed by me, and desire the same entered as my conclusions herein.