(April 12, 1913.)

## CALEB BRINTON Attorney in Fact of THOMAS W. JONES, Appellant, v. WESLEY STEELE and N. M. BEGGEMAN, Respondents.

[131 Pac. 662.]

EVIDENCE—SUFFICIENCY.

 1. Where the evidence is conflicting as to the facts, and there is substantial evidence supporting the findings of fact by the trial court, the findings and the decree entered in accordance therewith will not be reversed.

 2. Where there is substantial evidence supporting the findings of the trial court upon the issues of fact, and such findings can be reconciled as a whole, and the decree is in accordance with the findings supporting such issues, such findings will not be held to be contradictory or inconsistent.

 3. Where findings of fact are made and a decree entered wherein the boundary line between lots 12 and 13 in block 30 of the city of Lewiston is involved, and such findings are not certain, and will not enable the parties in interest to identify the exact line of division upon the ground, the findings and decree will be set aside and the trial court directed to make new findings and enter a decree describing the true line between the two lots by a correct and certain description, referring to monuments and markings upon the ground showing the true line.

APPEAL from the District Court of the Second Judicial District for Nez Perce County. Hon. Edgar C. Steele, Judge.

An action to quiet title to real property. Judgment for defendant. *Reversed.*

Ben F. Tweedy, for Appellant.

A judgment cannot stand when it is based on findings of fact which are antagonistic, inconsistent or contradictory as to material matters. (*Langan v. Langan,* 89 Cal. 186, 26 Pac. 764; *Learned v. Castel,* 78 Cal. 454, 18 Pac. 872, 21 Pac. 11; *Carman v. Ross,* 64 Cal. 249, 29 Pac. 510; *Sloss v. Allman,* 64 Cal. 47, 30 Pac. 574; *Reese v. Corcoran,* 52 Cal. 495; *Authors v. Bryant,* 22 Nev. 242, 38 Pac. 439.)

The finding that the plat line of Maxon and Briggs is the property line between lots 12 and 13 will not be implied or inferred, since it conflicts with the express finding that the row of poplar trees is the property line between 12 and 13. (*Beaverhead Canal Co. v. Dillon Electric Light etc. Co.,* 34 Mont. 135, 85 Pac. 880.)

Inconsistent and conflicting findings of fact are a ground for a new trial. (*Kerns v. McKean,* 65 Cal. 411, 4 Pac. 404; *Gwin v. Gwin,* 5 Ida. 271, 48 Pac. 295; *Manly v. Howlett,* 55 Cal. 94; *Reese v. Corcoran, supra; Learned v. Castle, supra; Sloss v. Allman, supra.*)


Geo. W. Tannahill and Fred E. Butler, for Respondents.

In case of conflict, the court will not disturb the findings of the trial court, who saw the witnesses upon the stand, heard them testify, and was acquainted with the circumstances surrounding their evidence. (*Pine v. Callahan,* 8 Ida. 684, 71 Pac. 473; *Stuart v. Hauser,* 9 Ida. 53, 72 Pac. 719; *Parke v. Boulware,* 9 Ida. 225, 73 Pac. 19; *Robertson v. Moore,* 10 Ida. 115, 77 Pac. 218; *Gumaer v. White Pine Lumber Co.,* 11 Ida. 591, 83 Pac. 771; *Heckman v. Espey,* 12 Ida. 755, 88 Pac. 80; *Later v. Haywood,* 15 Ida. 716, 99 Pac. 828; *Western Moline Plow Co. v. Caldwell,* 18 Ida. 463, 110 Pac. 533; *Weeter Lumber Co. v. Fales,* 20 Ida. 255, Ann. Cas. 1913A, 403, 118 Pac. 289; *Salisbury v. Spofford,* 22 Ida. 393, 126 Pac. 400.)

The respondents and their grantors have been in the open, notorious and adverse possession of the said tract of land for many years last past. The row of poplar trees has marked the boundary line between lots 12 and 13, and has been recog-

nized as such. The appellant has platted the land, sold lots, and permitted the respondents and others to build in accordance with the lines as established, and he is not now in a position to complain that the plat he filed is incorrect. (*Bayhouse v. Urquides,* 17 Ida. 286, 105 Pac. 1066; *Goltermann v. Schiermeyer,* 111 Mo. 404, 19 S. W. 484, 20 S. W. 161; *Brown v. Clark,* 73 Vt. 233, 50 Atl. 1066; *Lemmons v. McKinney,* 162 Mo. 525, 63 S. W. 92.)

STEWART, J.—This action was brought by appellant to quiet title to a strip of land near the line of subdivision between lots 12 and 13, block 30 of the city of Lewiston. The trial court entered a decree quieting the title in the respondent to the following strip of land: "A triangular strip of land, and every part thereof, the same being a strip of land 11 feet —— inches wide at the south end thereof, and at the north end both east and west boundaries terminate at the same point, the same being a part of lot 12, block 30, of the original plat of the city of Lewiston, Idaho, and the same being located on the west side of the row of poplar trees extending through and across said tract of land, marking the east boundary line of lot 12, block 30, of the original plat of the city of Lewiston, Idaho."

The evidence shows that the city of Lewiston was surveyed by E. B. True in August, 1874, and field-notes were prepared and a plat of said city according to such survey was prepared and approved by the mayor and trustees of the city of Lewiston on June 26, 1875, and was filed for record July 1, 1879, in the records of Nez Perce county. This plat shows block 30; the names of the streets are not clearly shown, but lots 12 and 13, block 30, are designated.

It appears that Wesley Steele, the respondent, is the owner of lot 12, block 30, and that the appellant Jones is the owner of the west half of lot 13, block 30, and that block 30 is a block in the original plat of the city of Lewiston, Idaho. The appellant Jones subdivided and platted the west half of lot 13, which was subdivided into lots, blocks, streets and alleys, and lots were sold according to such plat to various parties

who have built and constructed residences, business houses, and made substantial improvements in accordance with the plat of said west half of lot 13 of block 30.

The controversy arises from a dispute between the appellant and respondent as to the line dividing lots 12 and 13. Under the appellant's contention the strip in controversy and described in the decree is a part of lot 13 and is owned by appellant; while the respondent contends that the triangular strip described in the decree is a part of lot 12 and is owned by the respondent. The trial court concluded that the evidence supports the contention of the respondent, and that the strip of land in controversy is a part of lot 12.

This appeal is from the judgment. Several errors are assigned, all of which may be considered under the following contentions of the appellant: First, that the evidence does not support the findings and decree.

It appears that E. B. True made a survey of the city of Lewiston and prepared field-notes on the dates heretofore stated, and that Briggs, who had done surveying work for the government and the county, did work for Brinton in the way of subdividing lot 13, block 30 in the city of Lewiston, and in making a plat thereof. The survey was started at a monument at Kettenbach's on the east boundary of the old original town of Lewiston, and is shown by True's notes at a line east a half mile, north a quarter mile from the corner near the Normal school. Briggs testifies: "I brought that line down Main street and also along the foot of the hill until I came to the line between the public high school . . . . and . . . . I got to that line and I found from surveys that had been made by Mr. Bell that there was a monument at the west end of Idaho street. I took that for a stopping point; that checked up with the monument at the end of what we call Schoolhouse Lane; then I went down to the monument on C street, and it says 40 feet west and 40 feet south will establish the northeast corner of the block, now occupied by the Cash Hardware store. I took the course of that and it came to the south line of E street or Main street, and produced the southwest corner of Block 30; then from Mr. True's

notes—he gives some courses and distances, and I checked those out and then in order to establish the points where his courses are not given, I measured south from Main street and then swung that point so that the distance would fit that he gave in the notes, with the courses. Then I joined my work together and there was quite a discrepancy on the south boundary, but on the north boundary along the south line of Main street I think it checked out very close. Then I apportioned that distance in proportion—so many feet to the hundred. That gave lot 13 just about three feet lacking a very small fraction of an inch, that is on the angle that was made by extending lot 13 longer than the original survey made by True. I apportioned that distance and also gave the schoolhouse their proportion and the lot that belongs to Mrs. Whitman and also coming up along the brow of the hill, and from that distance I established the boundary line of lot 13. Then I divided that lot and I found that the excess there was about three feet as near as I can remember, and then I produced that line south to the center line of Main street, and I of course established the southwest corner from that line, found the distance by measuring back from Main street. And then I ran that line, and in running that line it hit the trees just as close to the center as I could see from off the hill. I found that I had to make an offset. By trees I mean the first tree that I struck in sighting, it was on the line between lots 12 and 13. The line hit the trees close to the center. I knew the trees were in the way, and I then went to Main street, that being the shorter distance than it was on the south side, and I measured the whole distance, and then I apportioned the distance that would be right south of the tree. That gave me my west point to run by from the southwest corner, and I produced that line and measured in and set the west boundary of the line. Then they talked about making some changes in the lots on the south where Mr. Steele's residence now is, and fixing some lots to get in through this alley, wanting an alley to come through. Mr. Brinton wanted an alley, but he wanted it himself, and he wouldn't dedicate it, he wanted a private alley, and I told him I wouldn't do anything with it

if he didn't want to dedicate it. He could lay his land out any way he wanted to, but I wouldn't do that, and by that time I got a telegram from the surveyor general and I turned the matter over to Mr. Maxon. I was city surveyor at that time, and had that Normal Hill sewer on my hands and other work. That is about all I did in that block. I apportioned the excess in this way: Mr. True's measurements, and it is that way with all surveyors that have chainmen, we don't exactly agree in measurements; now in this way, if Mr. True says that the south side of lot 12 is 88 feet and I make it 89 feet there is a foot of excess; there is a foot to be added, that is, in that proportion, not a foot, but the proportion that I make it. Now, in the whole distance, supposing there is forty lots and there is forty feet, and they are all exactly the same width, then I give each lot a foot, that is if I feel sure that my survey checked out exactly. After I came back from working for the government I went back and checked it over; that is, from this southeast corner of the schoolhouse; there is a permanent point; it is not a monument, it lays south of one, this monument at the schoolhouse, and the five-acre tract which is called Lot Five of Acres of the Risdon tract is tied onto the southeast corner of the schoolhouse lot; that is the only tie there is there. This St. John's place, there is no tie, only he shows here a post or corner. I apportioned that just as carefully as possible; and at that time I didn't know Mr. Brinton, had never met him in my life, and I didn't know him. I came here to this monument in schoolhouse lane and measured down until I came to the point that I had made coming up on the street to where Kjos had bought some land; I found that correct, and I came back to the southeast corner of the schoolhouse lot and ran out the schoolhouse lot, and Mrs. Whitman's lot, and found the old original post, we hadn't dug it out then, that is at the southeast corner of lot 13, and from there I measured up the same distance and found my point, and just went over the same ground on this offset line and checked into these stakes for Mr. Steele ju merely to check up the work; it checked up exactly; som measurements by a steel tape, and I apportioned it just as 1

did before. I couldn't designate the exact trees but about the 10th of May, 1873, I came here with Major Truax to try to.''

J. O. Maxon, a surveyor, testified that he did work in the way of platting the subdivision of lot 13, block 30 of Lewiston, for Mr. Brinton and for Mr. Briggs, who was making a survey for Brinton and who blocked out a part of the front lots at the north end; ''he had them staked out and the line of lots all set out, about 300 feet from the street along both sides of Ninth street, and he had the center line of Ninth street established, and then he turned over the matter to me. He also had a few of the stakes set on the west side of the alley, also on the east side of it, on the west side of lot 13. I found it absolutely correct as far as I checked it. I checked it all over and he told me what he had done, and I checked it all over carefully and found it absolutely correct—it might have been an inch off maybe somewhere, but that alley was absolutely correct to a hundredth of a foot; the stakes are there now, they show for themselves. I subsequently made a resurvey and recheck of this for the purpose of proving my work and proving the work of Mr. Briggs. I don't remember when the survey was made. We started at monument 13 and measured down along the south side of Main street, and we were fortunate enough to find the point that had been previously established there establishing the line on Main street between lots 13 and 14. There was a point set there, a hub driven down right close to a wall, there was a little stone wall there that perhaps you have noticed between 13 and 14, and we were fortunate enough to find that hub with a tack in it, and it checked exactly, and we measured the distance from there on down and found the center of Ninth street. That was the first work we did on that, I am positive of that, and then we turned the angle and the hub was still in at the center of Ninth street, that is at the south line of lot 13, the hub was still in that was placed there by Mr. Briggs when he first did this work, and we found that hub there, and we turned the angle to that hub, and proved the same course of the street that we originally had. We did

not assume there was any excess there because we had measured the proper distance to find the southeast corner of lot 13. I heard Mr. Wrighter's evidence that there was a strip of land there 11.65 feet at the south end and running to a point at the north. I found such a strip there between the fence and this line that was there, but not such a strip as that between the line—the east line of the Risdon tract, which is supposed to tie to this southeast corner of lot 13, or Mr. Storer's corner there. I did not find any excess west of this land that was platted by Mr. Brinton; there was a strip there between this fence and the line that was platted. I found the line between lots 12 and 13 exactly on the west line of that platted ground. I subsequently resurveyed the same; I think the plat gives the date; I would not be positive about that; it was along in November, 1911. The survey I made conformed to the survey made by Briggs absolutely; the hubs are there now to show them; our hubs are all there, every one of them can all be found, and most of the hubs that were set out when Mr. Briggs was there in 1904, I think it was, that this work was done for Mr. Nilsey and Mr. Cole and Mr. Brinton.''

It appears that there is a row of poplar trees on or near the line between lots 12 and 13, and respondents contend that this row of trees has been absolutely regarded as marking the boundary line for more than forty years; that no claimant to land in lot 13 has claimed land west of the row of poplar trees and no claimant or owner of lot 12 has claimed land east of the poplar trees until this controversy arose. Maxon also testified: ''I know just exactly what kind of fence was there when I came to this country in 1877; the trees were set out afterward along there; the fence was a post and rail fence; the trees were set out on the west side of the fence; the trees were set out about a foot west of the fence and were set out on lot 12; the fence lasted a long time because cedar in this country lasts a long time; there was some of that cedar there a long while—twenty years ago; I remember seeing some there as much as twenty years that I could remember of. These trees have been there and there was some wire along,

and the fence has been kept up partly between them. It has always been assumed, and until this controversy came up I never h ard anything else but that the trees there next to the fence were practically on the line—not until this controversy came up.''

The respondent testified that he had been acquainted with the property since 1902. When he bought the property he did not pay much attention to the line; he had a survey made and he located the stakes in there; that was about all he went on; he knew where they were. ''The row of trees, there is one stake—there are some of those trees, the upper trees I don't know, but the stake that is the furtherest, it is about the third tree from the end, or the fourth; the stake sets in on the east side of that tree, about a foot, I should judge, or a foot and a half; and that is as far as I know about the line from there on; that was one of the pegs, and then the other peg, that they put down, was right at the root of the big trees on the east side; the trees are all on the other side, and when this disturbance came up I didn't know—I just looked at the plat when I bought the ground, and I didn't think about there being a piece of ground in there, and I kept all the time thinking when he told me anything that it would make this on Ninth street come over this way and would throw mine back, and I never thought of there being any extra land because the plat didn't show it. The trees down there are just as I tell you. I think there are four trees there, and there is a peg—this was starting out at Main street and going to the last tree in that row—there is one of them pegs it would cut one tree through one-fourth of the way. The trees are substantially on the line, and going back there is another peg that would throw the trees on my side of the fence, that would throw the tree on the west side of the line where the pegs are set. No one ever claimed land on the west side of this row of trees who owned lot 13 until this trouble came up.''

It also appears that the fence was on the line with the trees, except at times it would be torn down and replaced, and at times was west of the row of trees and at times east of the row of trees.

On the part of the appellant, D. C. Wrighter, a surveyor, testified that he made a survey for Mr. Brinton and that he did not recollect exactly where he started, but the witness did state that he had many points in that block that he had previously checked up and knew were correct and ran from there and that he went to the known point of lot 10.  He commenced the survey at the northeast corner of lot 10 and he testified that he had established to his satisfaction where 11 and 12 were.  He had previously run around the block several times; he ran until he found that it coincided with the original notes, until they got it to check; until they got a survey that would plat, that would conform with what was intended on the original plat.  He testifies: "Where we haven't any definite information to go by we have to supply the omissions.  When I made Brinton's survey, when I got those interior lines on this subsequent survey of lot 13 I found that they did not reach the western boundary of lot 13.  For instance here, just let me explain a moment, please: 'Beginning so and so,' it says here, 'beginning at the northeast corner of a certain block and running so and so.'  Now, I didn't go into that; I was not making an original survey there; simply tracing somebody else's survey.  When I rechecked I was in it then; if I had known there was going to be any litigation I guess I would have kept out of it.  All I know is that I surveyed lot 13; I cannot tell you just exactly where I began or which stake is the last one I put in or where I ended.  I checked the entire block; I knew I was right when I started.  I would not start from an assumed point.  Block 30 does not tie to any monument in True's survey; monument 13 is not mentioned in the notes; we only assume that; we checked on it; we did not start from it because the course of Main street to-day won't give you the exact course of what True's notes do; you can start in the center of Main street to-day and go by True's notes and you wouldn't stay in the street.  The southerly end of Ninth street is in the wrong place, if it was intended to run Ninth street through the center of lot 13.  If Ninth street was moved west 5.65 feet, there would be an excess on the east half of lot 13, you would

have a wedge 11.3 feet wide as the plat stands to-day, as it stands on the ground.''

As a part of the evidence of Wrighter, the plat he prepared was admitted in evidence. There is a clear conflict between such survey and the plat of Maxon and Briggs as to the boundary or property line between lots 12 and 13, and the plat of appellant shows that the property line located by Wrighter was west of the row of trees, and not east of the trees, as testified to by Maxon and Briggs. The trial court in its findings and decree seems to have adopted the survey made by Maxon and Briggs. There is other evidence as to the line between lots 12 and 13. Some of this evidence supports plaintiff's claim and some supports the respondent's claim, and some of the evidence supports the contention that the fence as shown on the plat prepared by Wrighter shows the line coincides with the line of his survey. If the evidence was set forth in full, it would show that there is a strong conflict in the evidence as to the line between the lots 12 and 13, and the exact location of the row of trees, but the trial court evidently has taken the view that the evidence offered by the respondent fixed and described the line more clearly than the evidence on the part of the appellant. From our examination of the evidence we are inclined to think that the court made no mistake in its findings of fact, and that the evidence supports the findings and decree.

Second, it is contended that the findings are inconsistent and contradictory. While the findings are not certain and specific as to the location upon the ground, we think there is substantial evidence supporting the specific findings made by the trial court, and that such findings can be reconciled as a whole upon which the decree was entered, and that there is no contradiction or inconsistency in the findings.

Third, it is argued in appellant's brief that the findings of the trial court as to the line between lots 12 and 13 do not definitely and with certainty locate the line by the description, or upon the ground, so that the parties to the action are enabled to identify the exact line of division upon the ground. We are satisfied that this contention is well taken, and espe-

cially call attention to Finding No. 11, wherein the court finds "that the row of poplar trees extending from the north boundary of said lot to the south boundary of the same is located upon the line between lot 12, block 30 of the original plat of the city of Lewiston, Idaho, and lot 13, block 30 of the original plat of the city of Lewiston, Idaho, and that the said row of poplar trees has marked the boundary line between the said two tracts of land for more than thirty years last past." Also the decree, which adjudges: "That the defendant, Wesley Steele, have judgment and decree against the plaintiff, quieting his title in and to the said triangular strip of land and every part thereof, the same being a strip of land 11 feet —— inches wide at the south end thereof and at the north end both east and west boundaries terminate at the same point, the same being a part of lot 12, block 30 of the original plat of the city of Lewiston, Idaho, and the same being located on the west side of the row of poplar trees extending through and across said tract of land, marking the eastern boundary line of lot 12, block 30 of the original plat of the city of Lewiston, Idaho."

The evidence shows that the three poplar trees referred to by the trial court in the findings and decree are about three feet in diameter, and that such trees are not in line with the fourth tree. If the three trees were located upon the line between lots 12 and 13, and at the present time are about three feet in diameter, then the line between the two lots at the present time would have to be located through the center of the three trees, and not a foot and a half from the center of the trees, as the dividing line, and not on the west side of the trees or the east side of the trees. The line could not be a line running through the four trees. In the decree the court adjudges that the line between lots 12 and 13 is on the west side of the row of poplar trees extending through and across said tract of land marking the eastern boundary line of lot 12. The finding and decree, therefore, are uncertain as to the exact line of division between lots 12 and 13 as located by the trial court, and if it was the intention of the trial court that the line of division is established on the west

side of the row of poplar trees, such line would not follow the north line of lots 22, 23, and 24 of the survey made by Briggs and Maxon, which was adopted and approved by the trial court as establishing the true line between lots 12 and 13, as found in finding 11.

From the finding it is apparent that the dividing line between lots 12 and 13 is and should be fixed from the survey made by Briggs and Maxon by making proper apportionment of excess land in the southern ends of lots 12 and 13 and that being true, the true line between the two lots should be established and identified by a clear description in the findings and decree and also upon the ground by proper monuments.

This case has been in this court before (*Brinton v. Steele,* 19 Ida. 71, 112 Pac. 319), and the judgment should be certain and definite, and establish and identify upon the ground the true line dividing lots 12 and 13, which cover the strip of ground involved in this suit. This can be done by placing proper monuments by a competent engineer, so that the parties to this action will be able to identify the true line dividing lots 12 and 13 in accordance with the findings of the trial court.

The judgment is *reversed,* and the trial court is directed to proceed and carry out the views expressed by this court and incorporate in the findings and decree the suggestions and directions of this opinion. The costs in this appeal are divided equally between the parties.

Ailshie, C. J., and Sullivan, J., concur.

Petition for rehearing denied.