(November 13, 1913.)

ETTA DEARING, Appellant, v. J. W. HOCKERSMITH,
GRANGEVILLE SAVINGS & TRUST COMPANY
and F. L. LEONARD, Cashier, Respondents.

[136 Pac. 994.]

CONSPIRACY—DEFINITION—PLEADING—SUFFICIENCY OF ANSWER.

1. Where a demurrer is filed to certain answers, and such demurrer assigns as grounds (1) that the answers do not state facts sufficient to constitute a defense in the action, (2) that the two answers and each of them are ambiguous, uncertain and unintelligible, and this court finds that the answers consist of denials and of affirmative matter which were proper defenses to the complaint, there was no error on the part of the trial court in overruling the demurrer.

2. Where D. draws a check in favor of H. and it is agreed between D. and H. that H. is to act as trustee and agent to draw the money and apply it for the purpose of paying a mortgage upon real property belonging to D., and H. presents the check to the bank for payment, and the bank pays such check, such payment is a cash discharge of D.'s deposit to the extent of the check drawn.

3. Where the record of the bank shows that a deposit on the 18th day of November was received by the bank from H., and said deposit includes different checks to different parties, among which was the check in controversy, and the bank credits all of said checks in the personal name of H. on his personal account with the bank made on that day, as a depositor and not as a trustee, and the evidence shows that there was nothing said at the time or at any other time that the sum so deposited should not be drawn by H. on his own personal check for such use as H. might determine to apply it to, nor that the bank was advised in any way that such deposit made that day should be applied to any particular purpose, and the trial court in his findings so found, the bank is justified when it pays on presentation of checks and charges the same against the deposit of H. until said deposit is exhausted. The court did not err in making a finding to that effect.

4. Referring to the allegations of the complaint in this case, it is alleged that H., the trust company, and L., the cashier of the trust company, acting in concert and without the knowledge of the plaintiff, combined, connived and conspired for the purpose of cheating and defrauding the plaintiff out of $625 by fraudulent statements

made to her by L. and H. inducing the plaintiff to sign her name to the check on the trust company where she had deposited said money in the name of H. and made payable to him. We have recited in this opinion as briefly as we could the evidence directly connected with the deposit, and after careful consideration we hold that there is no evidence in this case, or any law when applied to the facts, which would subject the defendant bank or L. to any damage resulting from a conspiracy by defrauding plaintiff or misappropriating $625, or any sum, for the use or benefit of L. or anyone connected with the bank, for which they were under obligation to answer.

5. Where the evidence shows clearly that the preponderance of the evidence is with the defendants, under the rule of this court where the evidence is only indefinitely conflicting as to some fact which is not controlling as proof, and there is substantial evidence supporting the findings of fact by the trial court, the findings and decree entered in accordance therewith will not be disturbed.

APPEAL from the District Court of the Second Judicial District for Idaho County. Hon. Edgar C. Steele, Judge.

An action to recover the sum of $625 alleged to have been placed under the control of J. W. Hockersmith as trustee of appellant, claiming that Hockersmith and one Frank L. Leonard, cashier of the Grangeville Savings & Trust Company, combined, connived and conspired to appropriate and apply said sum to their own use. *Affirmed.*

L. Vineyard, for Appellant.

In the absence of specific denials of a verified answer to a verified complaint, the answers would not raise a material issue under our statute. (Sec. 4183; *United States v. Shoup,* 2 Ida. 493, 21 Pac. 656.)

These answers stated no defense even had they been verified. (Boone on Code Pl., sec. 61; 31 Cyc. 87; *Doll v. Good,* 38 Cal. 287; *Fitzgibbon v. Calvert,* 39 Cal. 261.)

The findings excepted to do not respond to any issue in the pleadings, the same being against the admitted facts, and therefore of no effect. (Hayne, New Trial & Appeal, sec. 242, and authorities cited; Spelling, New Trial & Appellate Practice, sec. 591; *Speegle v. Leese,* 51 Cal. 415.)

The court erred in admitting testimony on matters not put in issue by the pleadings; such evidence was incompetent for any purpose, not being material to any issue, even though not objected to. (1 Spelling, New Trial & App. Prac., secs. 238, 410.)

"A finding must be supported by the legal effect of relevant and material evidence in order to withstand a motion for a new trial." (1 Spelling, New Trial & App. Prac., sec. 238, p. 409.)

As to the right of the plaintiff to recover this trust fund from the defendants jointly and severally as claimed, see *Duckett v. National Mechanics' Bank,* 86 Md. 400, 63 Am. St. 513, 38 Atl. 983, 39 L. R. A. 84, note cited in 52 L. R. A. 790, and *Anderson v. Pacific Bank,* 112 Cal. 598, 53 Am. St. 228, 44 Pac. 1063, 32 L. R. A. 489.

C. T. McDonald and Jas. De Haven, for Respondents.

Where the evidence is conflicting as to the facts, and there is substantial evidence supporting the findings of fact by the trial court, the findings and decree entered in accordance therewith will not be reversed. (1 Spelling, New Trial, sec. 238, p. 408; *Brinton v. Steele,* 23 Ida. 615, 131 Pac. 662.)

The case of *Duckett v. National Mechanics' Bank,* 86 Md. 400, 63 Am. St. 513, 38 Atl. 983, 39 L. R. A. 84, being the case most strongly relied upon by appellant, instead of sustaining appellant's contention, fully sustains the position taken by respondents.

Neither the respondent bank nor F. L. Leonard, cashier, had notice that the check given by appellant to Hockersmith and by him deposited in the respondent bank was a trust fund. (*First National Bank v. Valley State Bank,* 60 Kan. 621, 57 Pac. 510; *Munnerlyn v. Augusta Bank,* 88 Ga. 333, 30 Am. St. 159, 14 S. E. 554.)

STEWART, J.—This is an action brought by appellant against the respondents to recover the sum of $625, alleged to have been placed under the control of J. W. Hockersmith as trustee of appellant, and it is claimed that Hockersmith

and F. L. Leonard, cashier of respondent bank and trust company, combined and connived and conspired to appropriate and apply said sum to their own use.

The allegations of the complaint were denied by the defendants, except the issuing of the check of the plaintiff to Hockersmith. The case was tried and judgment was rendered for the respondents and the action was dismissed. A motion for a new trial was made and denied, and this appeal is from the judgment and also from the order denying the motion for a new trial.

A motion has been made in this court to dismiss the appeal from the order overruling the motion for a new trial, for the reason that no notice of motion for a new trial and no motion for a new trial were ever filed, and there was no certificate of the presiding judge in said cause showing what papers or records were used upon the hearing or notice of intention to move for a new trial or upon the motion for a new trial. This motion is sustained as to the appeal from the order overruling the motion for a new trial, and the case will be considered on the record as an appeal from the judgment.

It is necessary in this opinion to set forth the substance of the pleadings, for the reason that the appellant relies upon this appeal that the court erred in overruling the demurrer to the answers, to which exception was taken.

The complaint alleges that the plaintiff is a widow, and that at the death of her husband on the 3d day of August, 1909, the plaintiff's husband was the owner of a dwelling-house and lot in Grangeville, upon which a real estate mortgage existed unpaid for the sum of $600 and interest; that J. W. Hockersmith is the administrator of the said estate of Robert J. Dearing, deceased, and has been so since his appointment; that the appellant reposed faith, trust and confidence in him and his honesty and integrity, and placed in his hands on or about the 3d of November, 1909, the sum of $625, her own individual and separate property, to be applied by Hockersmith in payment of said above-mentioned mortgage, and that Hockersmith accepted and promised and agreed with the

plaintiff to apply and pay the same on said mortgage and for no other purpose; that contrary to said agreement and promise, and in violation of the trust and confidence reposed in Hockersmith and contrary to his agreement and promise, Hockersmith and the Grangeville Savings & Trust Company (this defendant will hereafter be designated as trust company), by and through the said defendant F. L. Leonard, the cashier of said trust company, acting in concert and without the knowledge of the plaintiff, did on or about the 3d of November, 1909, combine, connive and conspire for the purpose of cheating and defrauding the plaintiff out of the said $625 by the following false and fraudulent statements made to her by the said Leonard, with the knowledge of the defendant Hockersmith, to wit, by fraudulently inducing her, the plaintiff, to sign her name to a check on the said trust company, where she had deposited said money, in the name of Hockersmith, and made payable to him, and in return for so making said check defendant Leonard fraudulently induced her to believe, by stating to her, that he would see that the said money placed to the credit of Hockersmith would be paid on said mortgage as soon as it would be due or accepted by the owner and holder of said mortgage; that relying upon said statements of the defendants, which were made for the purpose of cheating and defrauding this plaintiff, she signed said check; and that contrary to the terms of said trust, defendants fraudulently diverted and misappropriated the $625 to their own use and benefit, without her knowledge, until long after it was so misappropriated, to wit, about the 23d day of March, 1912; that $625 was allowed to be checked out by said Leonard by said Hockersmith on debts and liabilities Hockersmith owed said defendant trust company, and with full knowledge as aforesaid on the part of Leonard that said act was fraud upon the rights of the plaintiff, and contrary to the terms of said trust and to her damage, for which she prays judgment.

The defendants, the trust company and Leonard, filed an answer, and deny that Hockersmith and the trust company by and through Leonard, or otherwise, acting in concert and

without knowledge of plaintiff, or otherwise, did, about the 3d of November, 1909, or at any other time or at all, combine, connive or conspire for the purpose of cheating or defrauding the plaintiff of $625, or any other sum whatever, or that the defendants, or either of them, made false and fraudulent statements to the plaintiff with or without knowledge of defendant Hockersmith, and deny that they, or either of them, fraudulently induced the plaintiff to sign her name to a check on the defendant trust company; deny that they fraudulently or otherwise induced plaintiff to sign a check in the name of Hockersmith, or any other person or at all; deny that Leonard fraudulently induced her to believe, by stating to her, that he would see that money paid to Hockersmith would be paid on said mortgage as soon as it would be due, or at any other time or at all; deny that relying upon said statements of defendants or either of these answering defendants, or which were made as aforesaid, she signed said check, and deny that false or fraudulent statements were made by either of these defendants; and deny that contrary to the terms of trust as aforesaid or otherwise made with her by said defendants, or either of them, they fraudulently diverted or misappropriated $625, or any other sum; and deny that any of said money was used or appropriated by the defendants, or either of them, and deny that the money was allowed to be checked out by Leonard, by Hockersmith on his debts or liabilities he owed the trust company, and deny that either of them had any knowledge of any fraud on the rights of the plaintiff; and deny that the defendants, or either of them, had any knowledge of any trust agreement between plaintiff and Hockersmith, and deny that by any acts of these defendants, or either of them, the plaintiff has been damaged in the sum of $625, or any other sum.

Hockersmith filed an answer, and denies that there was any conspiracy or conniving with or without the plaintiff's knowledge, or that he did on the 3d of November, 1909, or at any other time, connive or conspire for the purpose of cheating or defrauding the plaintiff out of the sum of $625 or any other sum; denies that he made any false or fraudu-

lent statements or that the said Leonard made any false or fraudulent statements to plaintiff, with knowledge of this defendant, and denies that by false or fraudulent statements or otherwise he induced the plaintiff to sign her name to the check on the trust company; denies any statement to the plaintiff for the purpose of cheating or defrauding the plaintiff; denies that this defendant fraudulently diverted or misappropriated the sum of $625. For a second defense, he alleges that on September 7, 1912, the defendant Hockersmith was duly and regularly adjudged a bankrupt, and that the indebtedness sued on herein was scheduled by this defendant, and the schedule filed with his petition for adjudication.

To these answers of defendants counsel for appellant filed a demurrer upon two grounds: (1) That said answers, and each of them, do not state facts sufficient to constitute a defense in this action; (2) that the answers, and each of them, are ambiguous, uncertain and unintelligible. The ruling of the trial court is assigned as error.

There is no merit in this contention. These answers consist of denials and of affirmative matter which were proper defenses to the complaint.

The trial court found in this case (1) that the Grangeville Savings & Trust Company is a corporation duly organized and existing under the laws of this state, with its principal place of business at Grangeville, and (2) that F. L. Leonard is and has been, during all the times herein mentioned, the cashier of the defendant corporation. The court also found (6) that the plaintiff did not deposit any money in the defendant bank in the name of J. W. Hockersmith, and that (7) defendant Leonard did not state to plaintiff that he would see that any sum or amount of money would be paid on said mortgage as soon as the same was due. The court also found (8) that no sum of money was deposited in the defendant bank by the plaintiff to the credit of defendant Hockersmith for any purpose whatever. As to the check, the court found (9) that the plaintiff drew a check against her own personal checking account in said defendant bank in the

sum of $625, said check being made payable to defendant Hockersmith individually and unqualifiedly, and was personally delivered by the said plaintiff to the defendant, J. W. Hockersmith, without the knowledge of the defendant, the Grangeville Savings & Trust Company, and its cashier, F. L. Leonard, or either of them. The court also found (10) that the defendant Hockersmith took said check and deposited it in the defendant bank to his own personal checking account, together with other checks and moneys and checked it out to his own use and benefit, and that said sum so deposited and checked out was not applied in payment of debts and liabilities he owed to the defendant Grangeville Savings & Trust Company. The court also finds (11) that the plaintiff made another agreement with the defendant J. W. Hockersmith in 1912, whereby he was not to pay the mortgage off on her place, but was to keep the said money and use it, and to pay her interest for the same.

There is no evidence in the record that contradicts or conflicts with the evidence offered by the defendants in support of findings 1, 2, 6, 7, 8, 9, 10 and 11, and there is evidence in the record which conclusively proves that the findings of the court above named are supported by the preponderance of the evidence.

Counsel for appellant contends very earnestly that the bank should be held responsible on the ground that Leonard, cashier, had notice that the check given by appellant to Hockersmith and by him deposited in the respondent bank was a trust fund, and relies upon the case of *Duckett et al. v. National Mechanics' Bank of Baltimore*, 86 Md. 400, 63 Am. St. 513, 38 Atl. 983, 39 L. R. A. 84. That case differs very materially from the case at bar. In that case there were two checks drawn on the City National Bank of Laurel, Maryland, and the first reads: "Pay to the order of James Scott, Cashier, Two Thousand Dollars ($2,000.00) for deposit to credit of Henry W. Claggett, being balance of purchase money due him as trustee from John R. Coale. C. H. Stanley." The second check is drawn on the bank and reads: "Pay to the order of James Scott, Cashier, Two Thousand

and Twenty-four and thirty one-hundredths Dollars ($2,024.-30) to deposit to the credit of Henry W. Claggett, trustee. C. H. Stanley.''

These two checks were deposited to the personal account of Claggett, and were dissipated by him. We have examined that case, and in our judgment, while the facts are not the same as the present case, yet the law applicable in that case is applicable to the case now being ·considered. The case is quite lengthy, and we quote from the syllabus:

''1. A check stating that it is 'for deposit to credit of' a person named without adding the word 'trustee' to his name, although it contains a further clause stating that it is 'the balance of purchase money due him as trustee,' does not impress the funds with a trust so as to prevent a bank in which he deposits it from crediting the check to his individual account.

''2. A check stating that it is for 'deposit to the credit of' a person named, with the word 'trustee' added to his name, is an explicit notification to the bank in which he deposits it that he is not the actual owner of the money, and if the bank credits it to his individual account, and loss ensues to the trust estate by reason of his drawing out the fund by check on his personal account, the bank is liable for participation in the breach of trust.

''3. A bank is not responsible for the use of trust funds made by trustee, unless it knowingly participates in the breach of trust, or profits by the fraud.''

If the law announced in the above case is applicable to the facts in this case, we are satisfied that the plaintiff cannot recover in this action against the · defendant, Grangeville Savings & Trust Company.

Before citing other authorities, we call attention to the check in question in this case:

''No.——        Grangeville, Idaho, 11/3, 1909.
        ''GRANGEVILLE SAVINGS & TRUST CO.
''Pay to the order of J. W. Hockersmith............$625.00
Six Hundred Twenty-five & no/100 Dollars.
                ''ETTA M. DEARING.''

The check, as introduced in evidence, bears the stamp of the bank and reads. ''Grangeville Savings & Trust Co., Grangeville, Idaho: Paid Nov. 18, 1909.''

The supreme court of Kansas in the case of *First National Bank of Sharon, Pa.; v. Valley State Bank of Hutchison,* 60 Kan. 621, 57 Pac. 510, holds: ''1. When an agent, rightfully in possession of his principal's money, deposits it in a bank of which he is president to his own credit and as a part of his general deposit account, and tells the cashier the name of the person to whom it belongs, and instructs him to remit it to the owner, but the remittance is not made, and the agent in a short time checks against the general balance of the account, inclusive of the deposit in question, reducing it far below the amount of such deposit, the bank has the right to presume that the agent knows the remittance has not been made and has revoked the order to make it, and that the checking out of the deposit by the agent is within the authorized terms of his agency; and in such case the bank will not be charged with notice of a trust in favor of the owner of the money to the extent of the deposit made by the agent.

''2. Nor does the trust in favor of the owner of the money arise if subsequently, and at a time when the agent's general deposit is below the amount of his principal's money deposited by him, he discovers that the remittance has not been made, and therefore directs that the balance to his credit be applied upon his debt due to his principal, if he is also at the same time indebted to the bank, and it chooses to assert its lien upon his funds for its protection; but the bank may refuse to do as directed, and instead thereof may apply the balance of his account to the payment of a debt which the agent in his individual liability owes to it.''

This case substantially involves the principle which applies to the facts in this case, although differing somewhat from it in point of fact.

A similar question was considered by the supreme court of Georgia in the case of *Munnerlyn v. Augusta Bank,* 88 Ga. 333, 30 Am. St. 159, 14 S. E. 554, and in that case the court holds: ''A check in favor of a third person signed by the

trustee as agent and presented by the payee is a sufficient demand for the repayment of the deposit, and upon refusal to pay the trustee's right of action becomes complete.''

Under the principle announced in the foregoing authorities there can be no question but that the rule of law applied to the facts in this case is as follows: Where one party draws a check in favor of another, and it is agreed between such parties that the payee is to act as trustee and agent to draw said money and apply it for the purpose of paying a mortgage upon real property, and the payee presents the check to the bank for payment and the bank pays such check, such payment is a cash discharge of the deposit of the party drawing the check to the extent of the check drawn.

The foregoing authorities were cases where the facts are practically the same as in this case, and the law applicable to the facts in those cases was applied, and we are of the opinion that it is a law that governs the facts of this case. While the evidence in this case shows that the plaintiff testifies that she took the check to the bank herself and left it there, this statement of the plaintiff is disapproved conclusively by the testimony of Hockersmith and Leonard, and the record of the bank. Hockersmith testifies that on the 18th day of November, 1909, he deposited in the bank the following checks:

"November 18, 1909. Check on trust company, $10.00; check on trust company, $30.00; check on trust company, $46.10; check on trust company, $15.65; check on trust company, $19.25; check on trust company, $208.00; check on trust company, $625; check on Bank of Camas Prairie, $8.15; check on Bank of Camas Prairie, $48.85; check on Bank of Camas Prairie, $5.15; total, $1,016.15.''

The bank record shows that this deposit on the 18th of November was received by the bank as stated by Hockersmith, and he was credited with the same in his own personal name on his personal account with the bank as a depositor, and not as a trustee, and the evidence also shows that there was nothing said at that time, or at any other time, that the sums so deposited should not be withdrawn by Hockersmith upon his

own personal check for such use as Hockersmith might determine to apply the same to, nor that the bank was advised in any way that such deposit made that day should be applied to any particular purpose, and the trial court in his findings so found.

Referring to the complaint in this case, wherein the cause of action is alleged, the allegation of the complaint was that Hockersmith and F. L. Leonard, cashier of the respondent bank and trust company, combined, connived and conspired to appropriate and apply said sum to their own use. This allegation was the basis and the facts upon which plaintiff sought to recover in this action, and the trial court found against the plaintiff.

We have above set out the allegations of the pleadings and the findings of the court and some of the evidence that was introduced. We will now call attention to the evidence that was given upon the question of the transactions which took place between Leonard and Hockersmith and the plaintiff, and the evidence relating to whether there was a conspiracy proved in this case to apply the sum involved to the use of such parties.

Counsel for appellant called as a witness the defendant Hockersmith and cross-examined him on plaintiff's behalf, and his testimony relating to the check, material to its history, and what was done with it, is here related, partly in detail without question and partly with the question and answer.

The witness states that he has been acquainted with the plaintiff, and that she came to their house as a little girl. The check was presented to him, and he states that the plaintiff drew the check and delivered it to him on the day of its date. He was asked this question. "Do you know how she came to deliver this check to you?" His answer was, "Well, she gave me the check. She had a mortgage on the place here. . . . . She had a little mortgage on her place here, and she gave me that check, and I was going to pay the mortgage and the mortgage was not due at that time, and there was not enough quite to pay the mortgage, and *I taken the check into the bank and passed it into the window.*" He was asked

whether she had the money in the bank when she drew the check and the witness replied: "I suppose it was or she wouldn't have gave it to me." He then admitted that he indorsed his name on the check. "She told me that the money was in the bank and that the money was there for the purpose of paying the mortgage." The witness was interrogated as to whether he had any conversation with Leonard, the cashier, with reference to the payment of the check and with reference to the payment of the mortgage, and he answered that he had. "She told me that she told Leonard." Then he was asked this question. "Well, did Leonard say anything to you about it? A. No. he did not. . . . . I knew what the check was for." He makes a statement, in answer to questions, that at the time the check was given he and the plaintiff talked about the matter and he was asked the question: "Did she authorize you to draw all that money out? A. Yes, sir. Q. How was it to be drawn out? What was to be done with it? A. In the first place it was to be applied on that mortgage. Q. That was the purpose for which it was deposited?" Some other questions that had been asked the plaintiff in a bankruptcy action were here read by counsel for plaintiff, and the witness answered as follows: "Q. And for no other purpose? A. No, not that I know of. Q. Did you ever have any conversation with Mr. Leonard with reference. to that? A. No."

Counsel then asked witness: "Now, have you got any explanation to make there when you took the check in as to the conversation you and Mr. Leonard had? A. I can tell you the conversation as soon as I remember it. I taken the check in and shoved it into the window and I says, 'Fred, here is that check.' Q. By 'Fred' you mean the cashier, you mean Mr. Leonard? A. Yes, sir, Mr. Leonard, and I says, 'What am I going to do with it?' I says, 'The mortgage isn't due and there isn't enough there to pay, any way,' and I says, 'I don't know what to do with it.' He says, 'Who is it to be paid to?' I says, 'Mr. Reed holds the mortgage, or at least he is attending to it, any way.' 'Well,' he says, 'you can just deposit it the same as your other

checks.   Mr. Reed would use it any way, and you may just as well have the use of it as Mr. Reed.'   'Well,' I says, 'what if this money should not happen to be in here at the time it is needed?'   'Well,' he says, 'your credit is good; we will stand back of it,' or gave me to understand that.''

We call special attention here to this language used by this witness, to show his intention at the time he took the check to use the money for his own use and not deposit it for any special use.

The witness was asked: ''Q. That he would take care of it?   A. That it would be taken care of.''   Counsel then read from the evidence taken in the bankruptcy proceedings the following questions: ''You never drew that money out yourself?   A. No.   Q. You never drew it out of the bank?   A. No.''   Counsel for defendants at this time made the statement that he did not think Mr. Hockersmith testified to that, and counsel for appellant said he did, and proceeded to read the same questions again, and counsel for appellant then asked the witness. ''What do you mean by that?   A. Well, I supposed it was checked out.   Q. You checked it out?   A. I don't just understand your question.   Q. At whose request did you check that money out?   A. Well, I was sending in checks there all the time.   Q. Well, I am talking about this $625, for the purpose of paying off this mortgage.   A. It was put in there for the purpose of paying off that mortgage. Q. Then at whose instance was it checked out?   A. Mine, I suppose.   I drew the checks. . . . . Well, I supposed when he said it went in there the same as my money, it was just the same.   Q. I understand.   A. And if it was checked out, it was just the same.   Q. Well, you owed the bank at that time?   A. Well, I could not swear to that, whether I did or not.   My impression is that I did.   Q. Did you owe that bank then?   A. At the time I deposited it?   Q. At the time that money was put in the bank by Mrs. Dearing.   A. I think I did.   Q. And as you stated you owed the bank? A. I did owe the bank; I think I did at that time.   Q. That is, that $625 was checked out for different things and not for the purpose of paying the mortgage.   A. That is correct.''

The witness was then asked whether Leonard was controlling that thing, and the witness answered: "What I mean by that, if I owed them any interest or anything like that, he always checked that himself, checked on me. Q. If you owed him anything? A. If there was anything owing in there he drew checks on me for it." Witness further states: "I was not present when the check was drawn; the check was handed to me. She was not in the bank when she handed me the check. Q. Did Leonard tell you what he was doing with that money? A. He did not. Q. Did not say what he was going to do with it, or what he did do with it? A. No, did not say anything."

We call attention to this answer, that Hockersmith denies that Leonard said anything to him about the use of the money when it was deposited, which corroborates the evidence of Leonard which we will call attention to later in this opinion.

Counsel again repeats the questions previously asked this witness about the conversation he had with Leonard when he took the check to the bank and repeats the question of a statement that the mortgage is not due: "And I says, 'I will better take it to Reed.' Q. That is the money, the check? A. Yes, sir." Counsel then reads a former question: "And he says—that is, Leonard—'You better deposit it to your credit here.' A. He, as I remember, did not say, 'you had better'; he just says, 'You deposit it in your own name.' Q. Here? A. Here, yes, sir. Q. Instead of at Reed's? A. Yes, sir; he says, 'Your credit is good.'" Further questions were asked the witness, which have been answered before, and such questions and answers were practically as formerly given.

The plaintiff was a witness and counsel for appellant asked her what arrangement, if any, she had made with Hockersmith and Leonard with reference to a portion of that money that was placed there and to her credit by the Artisans: "What arrangement, if any, did you make with reference to a disposition of a portion of that money? A. I talked with Mr. Hockersmith a day or so before I left, two days before I

left, that I would leave $625, as the mortgage was $600, and I thought I would leave $25 for little expenses he might need. Q. That would cover the interest? A. The interest was paid up until the next June, until the mortgage was due, and the taxes were also paid the year I left. I told him the mortgage would come due in June, June the 1st. I left here in November, and I told them that I wanted the mortgage paid. I then went to the bank the day before I left. I took my check book and went to the bank and made two checks for which I drawed one for $625, and made the other for $74 to myself. I wrote one to J. W. Hockersmith for $625. I went to Mr. Leonard and asked him what I should do with this check I have got. I have drawn it for this mortgage of .$625. He said, 'Mrs. Dearing, I will advise you to leave it. I will see that it is paid for nothing else except the mortgage.' I said, 'See that it is paid for nothing else, as I want a home for myself and the children.' Q. What did he say? A. He said it would be paid for the mortgage and nothing else. Q. Did you leave the check? A. I left the check in the bank with Mr. Leonard and he said he would see it would be paid for nothing else but the mortgage. He would see it was paid on the mortgage."

We call attention to the statement above made by the plaintiff, that she left the check in the bank with Mr. Leonard and he said he would see it would be paid for nothing else but the mortgage. This statement of the plaintiff contradicts the testimony of Hockersmith, in that Hockersmith testifies that he deposited the check delivered to him by Mrs. Dearing, and that he took the check to the bank with other checks and deposited them upon his own account. This statement of the plaintiff is also contradicted by Leonard's testimony, which will be referred to later on in this opinion. The witness then says she went away to Boise, for nearly two years; she could not hear from Hockersmith and she wrote Mr. McDonald, an attorney, about the matter. She was then asked if she got a statement from the bank and she answered she had: "I got it from the bank addressed on the envelope." This bank account reads as follows:

"Etta M. Dearing in Account with Grangeville Savgs. & T. Co.

Nov. 2, 1909, balance per pass-book...............$699.53
Nov. 2, 1909, deposit.............................  2.50
Check returned.......... .................$ 74.53
.    "       "        .............. ............ 625.00
Balance due you.......................  2.50

$702.03 $702.03
Balance due you 1–30–11........................  2.50"

The plaintiff was then asked when she first found out that the money had not been paid according to her understanding with Leonard and Hockersmith on the check that she left in favor of Hockersmith for that purpose. Her answer was: "I never really found out for sure. The first I found out I wrote to my father in law, Mr. Dearing, J. F. Q. What time was that? A. Right after I got that return from the bank. Q. In 1911? A. Yes. After I got the return from the bank, and then it was the first time I learned that the money had not been paid. I then wrote to Hockersmith. Got two letters from him. . . . . After I found out the mortgage had not been paid in 1911, I came up then in the spring of 1912, came up from Boise to Grangeville. Before I left Boise I was not satisfied writing to Mr. Dearing and I wrote to Mr. Hattabaugh. . . . . When I got to Lewiston I met Mr. Leonard. . . . . I asked him in regard to the matter. He did not know. I asked him if the money was left in the bank. He answered that he did not know and I asked him if Mr. Hockersmith had any account to meet with the bank, and he did not know, and I told him that I would be down at 9 o'clock in the morning when the bank opened, and he said the bank opened at 9 o'clock. I asked him if there was a note in the bank from Hockersmith to me. He said, nothing in the bank. He said it might be in Hockersmith's own bankbox which he had no right to show me. I then asked him if Hockersmith had any money in the bank. He says, 'Mrs. Dearing, there was a check drawn on the bank last week by

Hockersmith for $700 and some odd dollars, and the bank owes him nothing.' ''

As to the conversation had in the bank at 9 o'clock, she was asked: ''Q. State any further conversation with Mr. Leonard at that time. A. Well, I didn't have any further conversation with Mr. Leonard at that time. Q. He denied that he knew there was any money there to be paid on that mortgage? A. Yes, sir, he denied that absolutely, and as far as seeing the note, I never saw the note. I don't know there is a note there or not. Q. Did you ever authorize any note to be executed to you by Mr. Hockersmith? A. No, I never did.''

Leonard was called as a witness for the defendant and in his evidence gave testimony with reference to the transactions had by him and the plaintiff and Hockersmith. He testified that he was cashier of the bank. He was handed the check in controversy and was asked to examine the paper and state what it was and he answered, a check by Etta M. Dearing, dated November 3, 1909, drawn against the Grangeville Savings & Trust Company, payable to the order of J. W. Hockersmith, amount $625, indorsed by J. W. Hockersmith. He was asked if he had seen the check before. ''A. I presume I saw the check when the statement was made, I don't recall. Q. I will ask you whether or not this check was delivered to you for Hockersmith. A. It was not. Q. You heard Mrs. Dearing testify in regard to coming up here and making this check and giving it to you? A. I did. Q. State what the conversation was. A. Nothing, unless she asked me in regard to the standing of Hockersmith. Q. What was Mr. Hockersmith's standing at that time? A. That it was good at our bank at that time for a thousand dollars without security.''

A paper was handed Leonard by counsel for defendant and he was asked what it was. ''A. It is a deposit slip showing a deposit made November, 1909, showing the deposit made by Hockersmith.'' It happened to be a copy and some objections were made to it and counsel asked Leonard when he made the copy. ''A. A clerk made that out. Q. When?

A. Yesterday. Q. This deposit slip you say is Hockersmith's? A. Yes, sir. Q. Made out by one of your clerks? A. Of a copy of the deposit on that day. Q. I will ask you to state how much cash and checks Mr. Hockersmith deposited at the time he deposited the check from Mrs. Dearing to Hockersmith in the sum of $625. A. He deposited $1,016.15. Q. I will ask you to state approximately how long Hockersmith had been doing business with you. A. Since opening business in 1904. Q. I will ask you to state whether or not you told Mrs. Dearing anything in regard to this money should be applied on the mortgage on the place here. A. Why, Mrs. Dearing never talked with me in regard to us having any mortgage whatever. If Mrs. Dearing asked me she asked me in regard to the responsibility of J. W. Hockersmith as a customer and she got the same information as any customer that would come into the bank. Q. Who deposited that check? A. Mr. Hockersmith with other checks, as shown in the slip. Q. In March, 1912, when Mrs. Dearing came back, did you have a conversation with her in regard to Hockersmith owing her some money? A. I met her on the train and she talked about different matters and she brought up the Hockersmith proposition and I presume she did ask something. I could not tell whether he had money, and being on the train could not tell anything. Q. Do you remember her coming into the bank next morning? A. I do not. Q. Do you remember her ever asking you about the note? A. I don't remember her ever asking the question. I do remember her saying on the train that Hockersmith was to pay her interest. Q. How much interest was he to pay her? A. I don't remember the amount; I think 10%."

It was agreed by counsel that the statement of the bank heretofore referred to contains a history of the transaction with Hockersmith, the amount of the deposit made $1,016.15, and a copy of that statement has heretofore been incorporated in this opinion. The above statement was agreed to by counsel, that it showed what the books show in reference to the transaction between Hockersmith and the bank.

The witness was asked the question: ''When was the note given you? A. The last term of court he came in and handed me the envelope with the note. He says, 'Put that away for safekeeping,' and that is all I know about it. The note is down in the safe with the others, showing the whole thing, signed up and with the indorsement on the back of it. Q. You say the first time you knew about this note was when Hockersmith brought it to you in an envelope at the last term of this court? A. The first I saw of the note; I never saw the note before that.''

Some controversy arose whether the witness did not, on inquiry from counsel in November or October last that there was a note in the vault, bring out the note and show it to the attorney at the window in the presence of Hockersmith. ''Q. How long was it Mrs. Dearing was in your bank a day or two before she left for Boise? A. I don't remember talking to Mrs. Dearing after she got off the train. Q. I mean in Grangeville. A. I could not tell. Q. Was she down in your bank at that time? A. Might have been for all I know. Q. She might have had a conversation with you at that time? A. Might have. Q. Might have asked you with reference to this mortgage? A. Might have. Q. Might have talked with you about this money that was deposited by the Artisans to her credit? A. I don't know whether she did or not. She had the privilege of checking it to anybody she desired. Q. Did she write any checks to you? A. Not to my knowledge. Q. You say that this statement that you see shows her account in your bank which you sent her in 1911 showing the statement of her account? A. It is a copy of the ledger, a copy of her account. Q. It does not pretend to show that this money was disbursed. A. Nothing of my business to show how she got rid of her money. Q. How came you to render this statement to her? A. We sent out statements regularly every month. It bears date January 30, 1911.''

Upon cross-examination counsel further interrogated the witness: ''Q. After this money was deposited in the bank to Mrs. Dearing from the Artisans' lodge, did you ever at any time have any conversation with Mr. Hockersmith in

reference to what portion of that money was to be applied or what purpose? A. I am not supposed to know what that was for. Q. I am asking you if you ever had any conversation. A. I don't know as I was to have any conversation with Hockersmith. Q. I am asking you about that conversation. A. I am not supposed to know about it. I am not supposed to ask her her business or him his business. Q. Do you say then that you did not have a conversation with reference to this money. being paid on this mortgage which was embraced in this check of $625? A. Not at that time that deposit was made. Q. Well, at any other time? A. Well, not at that time, but I don't recall what was said after that deposit was made. That was a matter between themselves entirely. I was not present when that proposition was made. Q. After this check was made by Mrs. Dearing to Hockersmith? A. Her account shows when the check was put in. Q. Did you ever have any conversation with reference to what was to be done with it? A. I only know that she had that check and she checked it out to him. Q. All you know is that she paid this $625? A. Yes, sir. Q. Did not Gus Hockersmith ask you when he brought that check in there, what am I to do with that check, there is not money enough to pay the mortgage anyhow, Hockersmith said to you and you made a reply something like this, or he says first Reed won't take it, you asked about the mortgage whom it was payable to, he said to George M. Reed, that he held the mortgage, that it was not due, and he says, what am I to do with it, and you said to him, just deposit it here in your name, that you might as well have it as Reed,—did you ever have any such conversation? A. I don't know as I thought the check was made payable to him. I had no right as an outsider to come in; they could burn up the check if they wanted. Q. Did he not tell you at that time, in the course of that conversation, this money has got to be paid on this mortgage, and he said to you what, if I had all this money in my own business, what am I going to do when this has to be paid, and you remarked that you would attend to that and you would stand behind him? A. We were not collect-

ing anybody's mortgage. Q. Did you have such conversation? A. I did not. As I stated this morning, he was good for a thousand dollars, and he collected it afterwards. Q. Then you say you had no such conversation as that with Mr. Hockersmith? A. I don't say as I don't remember. I don't guarantee anybody's loss outside of the bank. Q. To be more specific, I will call your attention—did not Wess say to you when he took the check to you or exhibited it, he says to you, here is that check, and you says, yes, sir, that is what he said to you, and he says, further, he told you the mortgage is not due, he says, did you? Yes, and you told Leonard that and he says, yes; did you have any such conversation as that with him? A. If we did, I don't remember. He did not have to put that check into our bank, but he had enough outside to pay us off if he wanted to. Q. He says I better take it to Reed? A. That is not my testimony. Q. Then you said to him, you better deposit it to your credit here? A. I don't remember any such conversation; he might have asked if he could borrow money and I told him he could have it if he had the security. Q. He said to you if I should not have the money to replace it and you said we will fix that up? A. We were not guaranteeing mortgages. Q. Did you have that conversation? A. Not to my knowledge, if he was good any time after that he could have the money. Q. You says to him his credit was good and you would stand back of him, did you say that to him? A. No, sir. Q. I will ask you to state whether or not you ever had control of Mrs. Dearing's money in any respect from the time it was first deposited to her credit in the bank? A. None whatever, we have no control of anyone's account; they can check it out in fifteen minutes if they want to.''

We have taken particular pains here to state the evidence which relates to the conversations of these three witnesses with reference to the transactions involved in this action. I am satisfied from this evidence that there can be no question but that there is no evidence given by either one of the parties which even hints that any conspiracy was entered into between Leonard and Hockersmith to in any way defraud

or deceive the plaintiff in this case; but there is evidence that Hockersmith may have had in his mind that his long friendship with the plaintiff and her confidence in him could be used to secure her money for his own benefit by giving her a note drawing interest. The record is uncontradicted that he did draw a note, payable to the plaintiff, dated October 1, 1910, due on or before two years, for $625, at 10% interest from date until paid, payable October 12, 1912, and that after the plaintiff discovered that the money had been dissipated by Hockersmith she had a conversation with Hockersmith about paying the interest and tacitly consented to the note, and that she had corresponded about it. But it is clear in this case that Leonard had nothing to do with any of the transactions between the plaintiff and Hockersmith, except that the bank of which he was cashier received from the plaintiff for deposit in that bank $625 which was paid out upon the order of the plaintiff, and that there was no agreement made by Leonard or the bank to in any way obligate either Leonard or the bank for any obligations of Hockersmith to the plaintiff, or any agreement or suggestion made as to how the money should be used by Hockersmith or the plaintiff. If the facts in this case are sufficient in law to create a liability by a bank or a cashier of the bank, then the banks of this state have assumed a responsibility which will make it impossible for banks to subsist under the laws of this state.

Black's Law Dictionary defines conspiracy in criminal law: "A combination or confederacy between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful or criminal act, or some act which is innocent in itself, but becomes unlawful when done by the concerted action of the conspirators, or for the purpose of using criminal or unlawful means to the commission of an act not in itself unlawful."

Sec. 6540, Rev. Codes, defines conspiracy as follows: "If two or more persons conspire: 1. To commit any crime. . . . . 4. To cheat and defraud any person of any property by

means which are in themselves criminal, or to obtain money or property by false pretenses.''

The evidence in this case shows that the deposit of the check of $625 was made by Hockersmith as his own personal account, and that no other obligation or agreement was made between the bank or any of its officers and Hockersmith that such deposit should become a trust fund. The obligation of the bank when such deposit was made was to keep the fund safe and return it to the proper person who deposited the same, or to pay it to his order. If Hockersmith had deposited the check as a trustee, then as such trustee he would have a right to withdraw it, and the bank in the absence of knowledge or notice to the contrary would be bound to assume that the trustee would appropriate the money when drawn to a proper use. If this rule is not adopted it would place upon a bank a duty of inquiring and investigating as to the appropriation made of every fund deposited by a trustee or other like fiduciary, and if this duty is imposed it would practically put an end to the banking business, because no bank could possibly conduct business if without fault on its part it was held accountable for the misconduct or malversation of its depositors who occupy some fiduciary relation to the fund placed by them with the bank. (*Duckett v. National Mechanics' Bank,* 86 Md. 400, 63 Am. St. 513, 38 Atl. 983, 39 L. R. A. 84.)

As to the fact of depositing money in a bank in trust for a third person, a note to the above case cites the following: "See *Cunningham v. Davenport* [147 N. Y. 43, 49 Am. St. 641, 41 N. E. 412], 32 L. R. A. 373, and *Bath Savings-Inst. v. Hathorn* [88 Me. 122, 51 Am. St. 382, 33 Atl. 836], 32 L. R. A. 377.''

There is another ground which in our judgment is sufficient and conclusive as to whether this case should be reversed. The trial judge saw the witnesses who testified in this case and had a full opportunity to determine the credibility of the witnesses, and he made his findings and entered his judgment upon what he deemed to be the preponderance of the evidence received in the case. In my judgment there

is conflict upon several matters which are involved and upon which evidence was given upon both sides. The evidence of Leonard is contradicted by statements made by plaintiff and Hockersmith as to conversations which took place at the bank about what was to be done with the money, but Leonard's evidence is concise and decisive and there is nothing contradictory in any statement of Leonard's, either in his evidence given or his refusal or failure to answer particular questions which were propounded to him upon cross-examination. He had previously answered at different times the same questions and the cross-examination threw no light upon his statements; the evidence of plaintiff is contradicted in many facts by Hockersmith, and Hockersmith's testimony is contradicted by the plaintiff in certain matters and statements made by others; but notwithstanding this conflict, we think the evidence shows clearly that the preponderance of evidence is with the defendants, and under the rule of this court, where the evidence is only indefinitely conflicting as to some facts, and there is substantial evidence supporting the findings of fact by the trial court, the findings and decree entered in accordance therewith will not be disturbed. (*Brinton v. Steele,* 23 Ida. 615, 131 Pac. 662; *Stuart v. Houser,* 9 Ida. 53, 72 Pac. 719; *Rapple v. Hughes,* 10 Ida. 338, 77 Pac. 722.)

In Hayne, New Trial and Appeal, vol. 2, sec. 288, the author, in speaking of the rule above stated, says: "This rule has been announced more frequently than any other rule of practice."

The judgment appealed from in this case is *affirmed.* Costs awarded to respondents.

Sullivan, J., concurs.

Ailshie, C. J., sat at the hearing, but took no part in the decision of this case.

Petition for rehearing denied.